GRAYBAR  ELECTRIC  COMPANY,  Inc.,
Appellant,

v.

JOHN  A.  VOLPE  CONSTRUCTION  CO.,
Inc., et al., Appellees.

No. 24126.

United States Court of Appeals
Fifth Circuit.

Dec. 1, 1967.

Thomas C. MacDonald, Jr., John I. Van Voris, Tampa, Fla., for appellant.

James Knight, Miami, Fla., Milton E. Grusmark, Miami Beach, Fla., Laurence A. Schroeder, Miami, Fla., for appellees.

Before RIVES and DYER, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge:

Graybar Electric Company, Inc., appeals from an order dismissing its Miller Act claim against John A. Volpe Construction Co., Inc.[1]

Volpe was the general contractor on a federal construction project known as the Federal Office Building of Miami. Diplomat Electric Company, a Florida corporation, was a subcontractor of Volpe on that project. Graybar Electric Company, Inc., sold to Diplomat some $252,-696.90 in electrical materials and supplies for use in the prosecution of the work on the Federal Office Building. Upon completion of the job, Diplomat was indebted to Graybar in the net amount of $27,696.99 after credits for payments or returns. Graybar gave timely notice of its claim and subsequently brought suit to recover this amount from Volpe and its sureties who contend that Graybar had been paid in full.

Whether Graybar was paid in full depends on the legal effect of three checks in the sum of approximately $77,000 which Volpe issued to Diplomat early in the course of the performance of the contract. Each of these checks was endorsed to the order of Graybar and then endorsed back to Diplomat by Graybar. Volpe contends that Graybar was obligated to credit the face amount of these checks against Diplomat's material account and thus has actually been overpaid.

The reason for such an arrangement is that Diplomat was unable to provide a payment bond to Volpe as its subcontract required. Volpe waived this provision of the contract, but, in order to protect itself, reduced the contract price by an agreed amount and also withheld progress payments to Diplomat. Shortly after the commencement of the job, Diplomat became short of cash. In order to enable Diplomat to meet its financial obligations, Volpe agreed to make progress payments to Diplomat by check provided that Diplomat would endorse each check to various suppliers before delivery to insure that the funds were not diverted to other uses. Three of these checks were issued to Diplomat for some $77,000 and they were endorsed to Graybar. At the time of these transactions, the total amount of the Diplomat material account with Graybar was approximately $13,000. Pursuant to a prior understanding with Diplomat of which Volpe had no knowledge, Graybar endorsed all three of the checks back to Diplomat, received

1. The Travelers Indemnity Company and Continental Casualty Company, Volpe's Miller Act sureties, are also parties to this appeal. 40 U.S.C. § 270b(a).

Diplomat's checks for the account balance of some $13,000 in return, and left Diplomat in control of the balance of some $64,000.[2]

If Graybar had credited the checks to Diplomat's material account rather than reendorsing them back to Diplomat, there would have been a sizeable overpayment rather than $27,000 unpaid at the end of the contract. In February 1963, one month after the issuance of the third check, Volpe learned of Graybar's having reendorsed the checks to Diplomat. In May of 1964, when Volpe received notice from Graybar that Diplomat still owed it some $27,000, Volpe held retainage which it owed Diplomat in the amount of $15,598.18. Volpe subsequently paid this retainage to Diplomat.

■■ Graybar has refined its position on this appeal. While in the District Court it sought the entire amount of its unpaid balance, it now seeks only the amount of the funds retained by Volpe and paid to Diplomat after Volpe had notice of Graybar's claim.[3]

---

2. The findings of fact made by the lower court are accepted as correct for the purpose of this appeal by the appellant Graybar. Two of these findings are material on this point:

"14. The evidence disclosed that the three checks in question were delivered to DIPLOMAT *only after* VOLPE *insisted* and obtained the endorsement to GRAYBAR. The endorsements were requisite to the delivery of [the] checks in question and the checks were delivered only upon [the] representation of DIPLOMAT and GRAYBAR that the total amount of each check represented the value of GRAYBAR materials delivered or in the process of delivery and that GRAYBAR would be paid the amount for such materials by endorsing the checks over to GRAYBAR." (Emphasis in original.)

"15. GRAYBAR helped DIPLOMAT obtain the checks from VOLPE upon the representation by GRAYBAR'S local manager that the amounts of each of the checks were in substance the requirements of GRAYBAR for the payment of materials delivered or being delivered to the job. The fact that GRAYBAR after receipt of the checks, would endorse *them back* to DIPLOMAT, was unknown to VOLPE, and the fact that GRAYBAR would retain only some $12,000.00 out of a total of $77,000.00 was also without VOLPE'S knowledge and consent. Since GRAYBAR received the checks upon its representation that it would apply the totals to its account, the payment by VOLPE was affected. The fact that GRAYBAR, for reasons undisclosed thereafter endorsed the checks back and took back checks of a lesser amount, could not change the fact of payment. * * *" (Emphasis in original.)

The evidence further revealed that Volpe, as a part of its efforts to insure that progress payments would be made only as to then current balances to materialmen and could not be diverted to other uses by Diplomat, refused to part with physical control of the checks in question until they could be delivered to a Graybar representative. Thus Graybar not only misrepresented the amount of its then current balance with Diplomat to Volpe, but it also actively participated in the delivery of the checks.

3. Diplomat sued Graybar in the Florida state courts for alleged breach of a warranty on certain light fixtures. In that suit, Graybar did not counterclaim for its unpaid balance then due from Diplomat for other materials used in the project. In the court below, in its motion for summary judgment, Volpe contended that Graybar's claim for unpaid materials constituted a compulsory counterclaim in the state court proceedings under Rule 1.13 of the Florida Rules of Civil Procedure, 30 F.S.A. which is comparable to Rule 13 of the Federal Rules of Civil Procedure. On this appeal, both parties have injected this issue into their briefs. This issue is not, however, before this Court since Volpe takes no cross-appeal from the denial of summary judgment. Since this is a Miller Act case, state law does not govern on substantive questions. R. P. Farnsworth & Co. v. Electrical Supply Co., 112 F.2d 150, 154, 130 A.L.R. 192 (5th Cir. 1940) ; St. Paul Fire & Marine Insurance Co. v. United States for Use of Dakota Electric Supply Co., 309 F.2d 22, 24 (8th Cir. 1962), cert. denied 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963). Assuming, arguendo, that Graybar's claim would be a compulsory counterclaim under Florida law, failure · to raise it there could not create a bar. Cf. Peterson Co. v. Applewhite, 383 F.2d 430 (5th Cir. Sept. 1, 1967).

In reply to Volpe's argument that Graybar has actually been overpaid, Graybar insists that since both it and Diplomat understood at the time of the receipt of the checks in question that they would be reendorsed to Diplomat there could not possibly be a "payment." Their subjective intent to the extent it is sought to bind Volpe is immaterial. The question is whether their manifest intention in representing to Volpe that certain sums were then due and owing to Graybar from Diplomat for materials used in the prosecution of the work on the contract and in receiving those funds from Volpe is such that the law will require application of those funds to that account. We hold that such application must be made.

■■■ "The purpose of the Miller Act is to protect those who furnish labor and material for public construction and to insure that they will be paid for the same." St. Paul Mercury Indemnity Co. v. United States for Use of H. C. Jones Construction Co., 238 F.2d 917, 921 (10th Cir. 1957). "The Miller Act * * is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." United States for and on Behalf of Sherman v. Carter, 353 U.S. 210, 216, 77 S.Ct. 793, 796, 1 L.Ed.2d 776 (1957). See, e. g., Trinity Universal Insurance Co. v. Girdner, 379 F.2d 317 (5th Cir. 1967); General Electric Co. v. Southern Construction Co., Inc., 383 F.2d 135 (5th Cir. Aug. 28, 1967). However, in carrying out this remedial purpose, "unjust and absurd consequences are, if possible, to be avoided," Glassell-Taylor Co. v. Magnolia Petroleum Co., 153 F.2d 527, 530 (5th Cir. 1946); and courts are not justified in writing li-

ability into a Miller Act bond, United States for Use of Edward E. Morgan Co. v. Maryland Casualty Co., 147 F.2d 423 (5th Cir. 1945). See, e. g., Aetna Casualty and Surety Co. v. United States for Use and Benefit of Gibson Steel Co., Inc., 382 F.2d 614 (5th Cir. Sept. 14, 1967).

■■■ The usual case in which a general contractor claims that a subcontractor's materialman has been paid and in which such materialman denies payment arises where there has been a prior course of dealing between the materialman and defaulting subcontractor which has resulted in a preexisting account between them. Materialmen in these cases seek to apply any payments received from the subcontractor to the preexisting indebtedness and present a Miller Act claim for some or all of the materials supplied for the government project.[4] In such cases, where there is a finding of actual or constructive notice that the source of the funds from which payment is made is the general contractor, materialmen must apply such funds received to the Miller Act claim. Consolidated Electric Co. v. United States for the Use and Benefit of Gough Industries, Inc., 355 F.2d 437 (9th Cir. 1966); Koehring Co. v. United States for the Use of Hoover Equipment Co., 303 F.2d 468 (10th Cir. 1962); St. Paul Fire & Marine Insurance Co. v. United States for the Use of Dakota Electric Supply Co., 309 F.2d 22 (8th Cir. 1962), cert. denied, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963); United States for the Use of Carroll v. Beck, 151 F.2d 964, 166 A.L.R. 637 (6th Cir. 1945); R. P. Farnsworth & Co. v. Electrical Supply Co., 112 F.2d 150, 130 A.L.R. 192 (5th Cir. 1940), rehearing denied 113 F.2d 111, 130 A.L.R. 197 (5th Cir. 1940), cert. denied 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454 (1941).

---

4. Inferentially, it appears from the record that there had been a prior course of dealing between Diplomat and Graybar. This job was, however, billed through a separate account. Even though there had been a prior course of dealing, Diplomat apparently had no balance due Graybar at the beginning of the Federal Office Building project. The fact that all the funds received from Diplomat were credited to the account of the Federal Office Building does not, however, serve to distinguish this case from the principles generally controlling. United States for the Use of Carroll v. Beck, 151 F.2d 964 (6th Cir. 1945).

Such an application in this case clearly results in overpayment.[5]

██ The rule is clear that, when a creditor comes into possession of funds under circumstances that he knows or is chargeable with knowledge [6] that all or a portion of the source of such funds is from a general contractor on a public project, the creditor is bound to apply such funds to the job account of the principal or general contractor notwithstanding any directions he may receive from his payor.[7] R. P. Farnsworth & Co. v. Electrical Supply Co., supra. This rule must be especially applicable where, as here, the creditor coming into possession of the funds has actively participated in their acquisition by misrepresentations as to the amount then due and owing.

██ Graybar relies on Moyer v. United States for the Use of Trane Co., 206 F.2d 57, 39 A.L.R.2d 1098 (4th Cir. 1953), a leading case on the application of the doctrine of estoppel to Miller Act cases. Volpe, in its alternative defense, also relies on *Moyer*. In that case, three materialmen sought to recover from a general contractor, Moyer Brothers, the value of materials furnished a subcontractor, Kegley, for use in the construction of a federal project. As in the instant case, the subcontractor was unable to supply a bond. During the performance of the project, Moyer refused to make further progress payments to Kegley unless Kegley could demonstrate that materials charged to that job had been paid for. The use-plaintiff materialmen supplied false receipts to the subcontractor, Kegley, who in turn forwarded the

receipts to Moyer Brothers. The general contractor, Moyer Brothers, however, made no payments in reliance on the receipts so furnished. It was held that the materialmen were not estopped from asserting their claim by the giving of false receipts since the general contractor had suffered no detriment. Thus it is, under proper factual circumstances, clearly settled that estoppel may be a defense in a Miller Act case. *Moyer*, supra; United States ex rel. Westinghouse Electric Supply Co. v. James Stewart Co., 336 F.2d 777 (9th Cir. 1964); United States for the Use and Benefit of Gulfport Piping Co. v. Monaco and Son, Inc., 336 F.2d 636 (4th Cir. 1964). However, in order for estoppel to lie, there must first be detriment to the party asserting it. *Moyer*, supra. Here, in making payments which it would not otherwise have made in the belief that such funds would be used to satisfy debts then due for materials used in the project, Volpe and its sureties suffered such a detriment. United States ex rel. Westinghouse Electric v. James Stewart Co., supra; United States for the Use and Benefit of Gulfport Piping Co. v. Monaco and Son, Inc., supra. See Columbia Digger Co. v. Sparks, 227 F. 780 (9th Cir. 1915). Cf. United States for the Use of Briggs v. Grubb, 358 F.2d 508 (9th Cir. 1966).

Despite the highly remedial nature of the Miller Act, it was provided for the protection of the "innocent." Thus, several courts have observed that a general contractor seeking to assert an estoppel against a Miller Act claimant could have done more to protect itself from possible misapplication of funds with which it

---

5. Graybar candidly admits in its brief that, "If the checks in question had in fact been credited by Graybar to Diplomat's material account, it would have reflected a substantial credit balance [overpayment] at the conclusion of the job * * *."

6. It has been held that "reason to believe" the source of payments received by a subcontractor's materialman is the general contractor, "taking the realities of the situation seriously into consideration" is sufficient to place the materialman under a duty to apply funds thus

received to the job account of the payor's general contractor. St. Paul Fire & Marine Insurance Co. v. United States for the Use of Dakota Electric Supply Co., supra, 309 F.2d at 30. Here, Graybar had actual notice of the source of the funds. Compare United States for the Use of Carroll v. Beck, supra, with Koehring Co. v. United States for the Use of Hoover Equipment Co., supra.

7. It has even been suggested that this obligation is a fiduciary duty. See F. H. McGraw & Co. v. Milcor Steel Co., 149 F.2d 301, 307 (2d Cir. 1945).

parted in order to allow a subcontractor to continue work. See, e. g., Glassell-Taylor Co. v. Magnolia Petroleum Co., 153 F.2d 527, 530–531 (5th Cir. 1946); United States for Use and Benefit of Lincoln Electric Products Co. v. Greene Electrical Service of Long Island, Inc., 252 F.Supp. 324, 328 (E.D.N.Y.1966). In the instant case, however, no matter how the conduct of Graybar is characterized, the fact remains that Volpe did everything it reasonably could do to protect itself short of completely taking over the operation of Diplomat. Under such circumstances, Volpe is entitled to assert an estoppel against Graybar for Graybar's conduct on which Volpe has relied to its detriment. The judgment of the District Court is therefore

Affirmed.