The **AMERICAN OIL COMPANY,**
a corporation, Plaintiff,

v.

**BROWN PAVING COMPANY, a corporation, and Great American Insurance Company, a corporation, Defendants.**

**Civ. A. No. 67–680.**

United States District Court
D. South Carolina,
Columbia Division.

April 9, 1969.

Douglas McKay, Jr., McKay, McKay, Black, Sherrill, Walker & Wilkins, Columbia, S. C., Lloyd C. Caudle, Wardlow, Knox, Caudle & Wade, Charlotte, N. C., for plaintiff.

R. W. Dibble, Jr., Edens, Woodward & Butler, Columbia, S. C., I. Edward Johnson, Teague, Johnson, Patterson, Dilthey & Clay, Raleigh, N. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

DONALD RUSSELL, District Judge.

In compliance with Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

### FINDINGS OF FACT

1. This is a suit to recover upon a Payment Bond, executed by Great American Insurance Company on behalf of Brown Paving Company, to assure payment for all "labor and material" furnished in completing a contract awarded by the South Carolina Highway Department on April 28, 1966, to Brown Paving Company for road construction in Lexington County, South Carolina. The amount of the account in question, covering asphalt furnished for the Lexington project, is $106,953.54.

2. The American Oil Company, plaintiff (hereinafter referred to as American), is a corporation organized and existing under the laws of Maryland. Its principal place of business is in Chicago, Illinois. Brown Paving Company, defendant-insured (hereinafter referred to as Brown), is a corporation organized and existing under the laws of North Carolina. Its principal place of business is in Lexington, North Carolina. Great American Insurance Company, defendant-insurer (hereinafter referred to as Great American), is a corporation organized and existing under the laws of New York. Its principal place of business is in New York, New York.

The requisite diversity of citizenship is present, the amount in controversy exceeds Ten Thousand Dollars, exclusive of interest and costs, and this Court has jurisdiction under the provisions of 28 U.S.C.A. § 1332.

3. For many years, Brown was engaged in road construction under contracts awarded by the Highway Departments of North and South Carolina. It was required in both States to furnish a Payment Bond for all projects. Such bond assured payment to all materialmen supplying materials for the project.

4. Brown's contracts with the Highway Departments in both States provided for monthly percentage advance payments to the contractor, calculated on an estimate of work completed during the previous month. All such advance payments received by Brown were deposited by it in its single regular checking account, from which all bills of creditors and suppliers on any of its projects, after withdrawing funds for deposit in a special payroll account, were paid.

5. For many years, American had sold Brown all asphalt materials used by the latter under its State contracts. Such sales were separated on American's books by projects. American billed Brown

monthly for the amounts due on all purchases, both as made in the preceding months and in any earlier periods. Such monthly bills, which did not break down the account by projects but stated simply the amount due on all previous monthly deliveries, were accompanied by copies of invoices, identified by project, for materials sold during the immediately preceding month. By reference to these invoices, the various deliveries during the month could be allocated to specific projects.

6. On April 28, 1966, Brown Paving was awarded a contract by the South Carolina State Highway Department for highway construction in Lexington County. Great American furnished the required Payment Bond which contained the following language:

KNOW ALL MEN BY THESE PRESENTS, That we, the PRINCIPAL and SURETY above named are held and firmly bound unto the South Carolina State Highway Department, hereinafter called the Department, in the penal sum of the amount stated above, for the payment of which sum well and truly to be made, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally, firmly by these presents.

THE CONDITION OF THIS OBLIGATION IS SUCH, that whereas the principal entered into a certain contract with the Department, numbered and dated as shown above and hereto attached:

NOW, THEREFORE, if the principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the surety being hereby waived, then this obligation to be void; otherwise to remain in full force and virtue.

IN WITNESS WHEREOF, the above-bounden parties have executed this instrument under their several seals on the date indicated above, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

On March 7th, 1966, before the bond for the Lexington Project was written, Great American secured agreements of indemnity from Brown and individual indemnitors W. F. Brown, Sr., Clara Belle Swaim Brown, W. F. Brown, Jr., Marylen W. Brown, E. L. Lippard and Georgia R. Lippard to indemnify Great American against loss as Brown's Bondsmen on any Payment Bond executed by it on Brown's behalf.

American supplied the asphalt materials used by Brown in performance under this contract. Its first delivery on this project was on June 1, 1966. Brown received its first monthly payment from this Lexington project on July 16, 1966. The last delivery made by American on the Lexington project was on November 22, 1966.

7. At all times while it was engaged in construction under the Lexington contract, Brown was involved in construction work on a number of projects in North Carolina, from which it received substantial payments. Among such projects was one covering road construction in Scotland County. Two were in Richmond County. Great American was the surety on the Payment Bond given in connection with the Richmond projects.

8. Between February, 1966, and February, 1967, Brown was continuously indebted to American in varying amounts for deliveries of asphalt material used on State projects, covered by Payment Bonds. During such period, American on several occasions wrote Brown, calling attention to certain past-due monthly accounts and stating that "it would be most appreciated if you (Brown) could arrange to forward payment" of at least one of the monthly billings. In the letter of February 7, 1966, American refers to November and December, 1965, deliveries. On July 28, 1966, American calls to Brown's attention past due accounts for deliveries made in the preceding March,

April, May and June. Again, on September 23, American requests payments on May, June, July and August deliveries. On only one occasion (i. e., letter of January 23, 1967) did American refer to specific projects. The payment that followed this letter, however, was not, by the instructions of Brown, applied to the projects to which American had referred.

9. A record of the various payments to American by Brown during the period involved in this controversy, along with a record of advances received during the same period by Brown, is as follows:

(a) In May and June, 1966, Brown received payments against projects under construction in the amount of $256,819.-44. None of these payments arose out of the Lexington project. During such period it made no payments to American for asphalt supplied for any of the projects on which it was engaged.

(b) During July, 1966, Brown received advances totaling $205,362.32 on account of three projects, one of which was Lexington and another Scotland. The amount of the payment accruing from the Lexington project was $64,375.07 received by Brown on July 16, 1966; the payment received from the Scotland project $87,172.32, received by Brown on July 28, 1966. During this month, Brown made a payment of $7,232.53 on July 29, 1966, to American, and this payment was applied, pursuant to Brown's instruction, against Brown's oldest outstanding account, which arose out of the Scotland project.

(c) Brown collected in August $192,-532.28, of which $104,797.30, paid on August 12, was attributable to the Lexington project and $55,172.90, paid August 26, to the Scotland project. In the same period, two payments, aggregating $18,288.82, were made to American, and were applied, by Brown's instructions, to the Scotland project account. One of these payments was in the amount charged against Brown for deliveries made in March, 1966 (i. e., $16,656.83). This payment was made on August 12,

1966. The other payment was made on August 26.

(d) In September, Brown collected one advance of $196,238.01, accruing from the Lexington project. It paid American in that same period $16,082.07, which by instruction, was applied on the Scotland account and extinguished American's account for April deliveries.

(e) In October, Brown received advances aggregating $156,576.59, of which $60,610.78 was attributable to the Lexington project and $38,909.66 to the Scotland project. No payments were made to American during this period.

(f) In November, Brown received payments aggregating $239,804.20. Two of these payments, made on November 16 and 21, and amounting to $37,526.55, arose out of the Richmond contracts. A payment on November 11 in the sum of $80,229.80 was received from the Lexington project. On November 25, a payment of $122,047.85 was received from the Scotland project. Two payments were made to American during this month: One for $10,548.63 on November 21, which was applied to the Scotland project, and the other for $2,326.86 on November 28, which was applied to the Scotland-Richmond accounts.

(g) In December, Brown's advances amounted $154.177.91, Lexington representing $50,652.64 of these advances (received December 10), Scotland $23,626.83 (received December 30), and Richmond $59,648.44 (received December 12). Brown made a payment of $8,252.51 to American on December 13 and this payment was credited on the past due Scotland account.

(h) In January, 1967, Brown received payments against construction in the amount of $139,303.01. Of this amount, $78,600.62, paid on January 24, was derived from the Scotland project and $7,-130.15, paid on January 18, from the Lexington project.

(i) In February, Brown received no construction payments, but, in the early part of the month (February 6), it paid American $7,299.20, of which $2,510 was

applied to the Lexington invoices and the balance to Scotland.

10. In making its payments to American, Brown instructed American to apply such payments to particular accounts. American applied those payments to the accounts as directed by Brown.

11. American had no specific or exact knowledge of the sources or amounts of Brown's income from which Brown made payments to American. American did have general knowledge, customary in the trade, that Brown filed progress estimates covering work done on its several North Carolina and South Carolina highway projects and received payments in unspecified sums from such projects monthly as work progressed thereon and it did know that Brown's source of funds was the various public projects on which it was working, though it did not know the division of such funds as received by Brown among the specific projects. American did not know the exact work status of any of the work projects, the amounts of progess payments requested thereon, the amounts of payments received thereon by Brown, nor the dates Brown received such payments. The records of Brown, which were not available to American, indicate that the timing of payments against the several projects varied considerably. Thus, payments on the Richmond and Lexington projects, one in North Carolina and the other in South Carolina, seem to have been made about the same time each month. Payments on the Scotland job, on the other hand, generally were received during the latter part of the month.

12. In directing the application of payments made to American, Brown had no prior consultations with American; and, until it received directions for such applications from Brown, American had no knowledge of the projects to which Brown wanted payments applied.

13. During the period involved with the construction of the Lexington County project, American had no knowledge of the financial condition of Brown and did not know that Brown was in financial difficulty. Nor is there any evidence of collusion between American and Brown to defraud Great American as surety.

14. The balance now due American for asphalt materials furnished in connection with the Lexington project, the payment of which was assured by Great American's Payment Bond, is, according to the computations of the South Carolina Highway Department, $106,953.54.

15. Sometime prior to filing suit herein, American made demand on Great American for the balance due it by Brown for materials furnished on the Lexington project.[1] Great American having failed to make payment,[2] this action was filed on September 29, 1967. After suit was filed, Great American by its answer filed October 23, 1967, denied liability because, among other things, of its claim that payments credited to Brown's account for materials furnished for the Scotland project should have been credited to the Lexington project. So far as the record shows, this was the first time that Great American had raised any question about the propriety of the application of payments received by American. Prior to the filing of this answer of Great American herein, on October 11, 1967, American accepted from the surety on the Payment Bond given for the Scotland project the balance shown on its books, after giving effect to all payments credited thereon, and executed a release in favor of such surety.

16. After demand by American and other creditors, Great American filed suit on or about August 10, 1967, in the United States District Court for the Middle District of North Carolina to recover of the indemnitors for all liabilities incurred by it on account of its Payment Bonds executed in favor of Brown on the Lexington and Richmond projects. In its complaint, Great American alleged on information and belief that Brown had failed "to pay valid claims arising

1. The record does not indicate when this demand was made.

2. The reason assigned by the surety for denying the claim of American does not appear in the record.

thereunder (i. e., under the Lexington and Richmond contracts) in the total sum of at least TWO HUNDRED TWENTY-THOUSAND SEVEN HUNDRED NINETY-TWO DOLLARS AND FIFTY-FIVE CENTS ($220,792.55)". To what exact extent the Lexington project figured in this computation was not stated in the complaint.

17. After the institution of this action, Brown was placed in a voluntary trusteeship for the benefit of its creditors. Certain actions have been taken in connection with such receivership, about which differences between the parties to this action have arisen. Such differences, however, are without the scope of this action.

## STATEMENT OF ISSUES

It is conceded that American sold to Brown the materials covered by its account herein and that the materials so sold were used by Brown in construction under the Lexington contract, on which Great American was surety. American is accordingly entitled to judgment upon Great American's bond, unless Great American's contention that certain payments, made to American by Brown and applied to other accounts due by Brown, should have been credited upon the Lexington account. These payments, three in number and made in August, September and December, aggregate $40,991.41. The right of the surety to require the reallocation of such payments to the account for which it is obligated represents the issue for determination.

## DISCUSSION

 There is no dispute between the parties about the general rule for the application of payments when there are a number of accounts due the creditor by the debtor. Ordinarily, a creditor must apply the payments as instructed by the debtor; absent instructions from the debtor, the creditor may apply them as he chooses, between secured and unsecured matured debts, including past-due accounts; and, if neither creditor nor debtor allocates, the Court will apply the

payments as justice requires, generally to the advantage of the creditor in the absence of supervening equities. Maryland Casualty Co. v. City of South Norfolk (C.C.A. 4, 1932) 54 F.2d 1032, 1038, modified as to other points, 56 F.2d 822, cert. den. 286 U.S. 562, 52 S.Ct. 644, 76 L.Ed. 1295; Jones v. Kilgore (1845) 2 Rich.Eq. (19 S.C.Eq.) 63, 66; Bell v. Bell (1883) 20 S.C. 34, 46–47; Wardlaw v. Troy Oil Mill (1906) 74 S.C. 368, 371, 54 S.E. 658, 114 Am.St.Rep. 1004; Standard Surety & Casualty Co. v. United States for Use and Benefit of Campbell (C.C.A. 10, 1946) 154 F.2d 335, 337, 164 A.L.R. 935; Burton Swartz Land Corp. v. Commissioner of Int. Rev. (5th Cir. 1952) 198 F.2d 558, 561, 16 T.C. 1575. While not an inflexible rule to be applied in all cases, this means that, absent application by either debtor or creditor, the Court, in case one debt is unsecured, will apply the payment to the unsecured debt (Bell v. Bell, *supra*, p. 47, 20 S.C.) or, if the account is a current one, will apply the payment "to the oldest items first" (Wardlaw v. Troy Oil Mill, *supra*, p. 371, 74 S.C., 54 S.E. 658). To these rules there is this qualification, recognized in most jurisdictions: If the creditor knows, or has reason to know, that the funds out of which the payment was made arose out of advances made on account of a contract covered by a surety's payment bond, he is obliged, irrespective of the instructions of the debtor, to credit such payment against accounts connected with that contract. Crane Co., U. S. for Use and Benefit of, v. Johnson, Smathers & Rollins (C.C.A. 4, 1933) 67 F.2d 121, 123; Koehring Company v. United States, etc. (C.C.A. 10, 1962) 303 F.2d 468, 470; Graybar Electric Co. v. John A. Volpe Construction Co. (C.C.A. 5, 1967) 387 F.2d 55, 59; St. Paul Fire and Marine Insurance Co. v. United States for Use of Dakota Electric Supply Co. (C.C.A. 8, 1962) 309 F.2d 22, 27, cert. denied 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767; United States for Use of Briggs v. Grubb (C.C.A. 9, 1966) 358 F.2d 508, 513; United States for Use and Benefit of Hyland Electrical Supply Co. v. Franchi Bros. Construction

Corp. (C.C.A. 2, 1967) 378 F.2d 134, 137; United States for Use of Carroll v. Beck (C.C.A. 6, 1945) 151 F.2d 964, 966, 166 A.L.R. 637; R. P. Farnsworth & Co. v. Electrical Supply Co. (C.C.A. 5, 1940) 112 F.2d 150, 153, 130 A.L.R. 192, reh. denied 113 F.2d 111, 130 A.L.R. 197, cert. denied 311 U.S. 700, 61 S.Ct. 139, 85 L. Ed. 454; Broward County, Florida Comm. for Use and Benefit of General Electric Supply Co. v. Continental Cas. Co. (D.C.Fla.1965) 243 F.Supp. 118, 123; United States Casualty Company v. Noland Company (D.C.N.C.1968) 286 F. Supp. 333, 337; Columbia Digger Co. v. Rector (D.C.Wash.1914) 215 F. 618, 630; Section 388, Restatement, Contracts; 5A Corbin on Contracts, sec. 1231; 72 C.J.S. Principal and Surety § 144, p. 632; 17 Am.Jur.2d p. 288; see, also, Rhame v. Jackson, et al. (1932) 165 S.C. 306, 309, 163 S.E. 724; *contra*, F. H. McGraw & Co. v. Milcor Steel Co. (C.C.A. 2, 1945) 149 F.2d 301, 307, cert. denied 326 U.S. 753, 66 S.Ct. 92, 90 L. Ed. 452 (decided under New York law which does not recognize the exception); and First Camden Nat. Bank & Trust Co. v. Aetna Cas. & Surety Co. (C.C.A. 3, 1942) 132 F.2d 114, 116, cert. denied 319 U.S. 749, 63 S.Ct. 1157, 87 L.Ed. 1704 (decided under New Jersey law; see, however, Hiller & Skoglund, Inc. v. Atlantic Creosoting Co. (1963) 40 N.J. 6, 190 A.2d 380, for a later statement of New Jersey law). The "authorities are at variance as to the character of the equitable consideration" which gives rise to this qualification of the general rules (Crane Co., U. S. for Use and Benefit of v. Johnson, Smathers & Rollins, *supra*, p. 123, 67 F.2d); which is "sometimes grounded upon abstract considerations of equity and justice, and sometimes upon an implied contractual obligation to the surety and his principal," (United States for Use of Carroll v. Beck, *supra*, p. 966, 151 F.2d). Whatever its basis, it is generally applied. It will be observed, however, that in order to warrant the allocation of a payment, without regard to the instructions of the debtor or the wishes of the creditor, under this qualification of the general rule, it is necessary both (1) that the payment be derived from performance under a contract covered by a surety bond assuring payment of materials furnished under such contract and (2) that the creditor knows, or has reason to know, that the payment was so derived.

Defendant suggests that, under South Carolina law, it is not necessary, in order for this exception to the general rules to be applicable, that the creditor know the source of the payment; it is sufficient that the origin of the payment be the contract covered by the surety's bond. For such position which is described in United States Casualty Company v. Noland Company, *supra*, as an "extreme position which courts generally have been unwilling to take", (p. 339, 286 F.Supp.) [3] it relies on Southern States Supply Co. v. Union Ind. Co. (1931) 161 S.C. 219, 226, 159 S.E. 532. There a surety sought credit for a payment, the source of which it contended was the contract on which it was obligated. It seems that the payment was originally credited against the account for which, under its bond, the surety was bound, but, after the bankruptcy of the debtor, was shifted to an unsecured debt owed the creditor.[4] The Trial Court

---

3. Columbia Digger Co. v. Sparks (C.C.A.9 1915) 227 F. 780 sustains the right of a surety, under these circumstances, to a reallocation of payments, without regard to the creditor's knowledge of the source of the fund. Such decision has not been regarded with favor. In the *Farnsworth Case* (p. 153, 112 F.2d) the Court pointedly observed that, "The Sparks case probably went too far, as contended by the dissenting judge, in asserting that notice to the payee of the source of the payment was unnecessary." However, as the dissenting opinion in the *Sparks Case* points out, there was actual knowledge by the creditor of the source of the payment; indeed the creditor-employee involved in that case made the payment on behalf of the debtor to himself as creditor (page 786, 227 F.).

4. That there is no such right to shift the application of a payment to the prejudice of a surety, is clear. Thus, in United

held that, in order to prevail, the surety was required to establish that the payment was "the exact money" paid under the contract for which the surety was bound and that it had failed in such proof.[5] If so paid, however, the statute law impressed a specific lien on such funds, which, as the concurring opinion of Mr. Justice Cothran emphasizes, made the matter of the creditor's knowledge irrelevant. (Page 231, 161 S.C., 159 S.E. 532.) Since the issue of the source of the funds was in dispute, the action of the Trial Court in granting a directed verdict was reversed and a new trial ordered. Under the peculiar facts of the case and because of the special statute, however, it was not necessary to decide "whether notice must be brought home to the creditor of the source of the payments before he may be required to waive his right to apply them as his interest may suggest" (Page 231, 161 S.C., page 536, 159 S.E.) and the statement of Mr. Justice Carter on which the surety relies ("if * * * it is later ascertained that it was paid out of funds received on the Buck contract, so far as the defendant (materialman) is concerned, it should be credited on that account", p. 226, 161 S.C., page 534, 159 S.E.) is thus accurate when viewed in the context of the facts of that case but extends no farther.

That knowledge of the source of the payment is essential to vitiate the right of the debtor or creditor, as the case may be, to determine the application of the payment, under South Carolina law, seems to follow, inferentially at least, from the later decision in City Lumber Co. v. National Surety Corp. (1956) 229 S.C. 115, 92 S.E.2d 128, where a principal contractor made payable jointly to a subcontractor and the latter's creditor an advance payment, which was not applied by the creditor to the debts arising out of the subcontracts. The Court did hold that the surety on the subcontract was entitled to credit for the payment on the debts for which it was obligated on its bond and vitiated an application of such payment to other debts owed the creditor, but it significantly observed (p. 120, 229 S.C., p. 30, 92 S.E.2d): "The source of the money was known to the respondent (the creditor)." This latter observation seems to place South Carolina law in line with the general rule and to make knowledge an essential element in a right of reallocation. See, also, Bryce Plumbing & Heating Co. v. American Surety Co. (1931) 162 S.C. 239, 160 S.E. 593; Rhame v. Jackson et al. (1932) 165 S.C. 306, 163 S.E. 724, 9 S.C.Q. 137, note 9a. In the *Rhame Case,* the Court seems even more emphatic, stating the rule thus, quoting 30 Cy., 1237 (p. 309, 163 S.E. p. 725):

"Another exception to the rule that the creditor has the right to apply the payment obtains when the money *with which the payment is made is known to the creditor to have been derived from a particular source or fund,* in which case he cannot, without the consent of the debtor, apply it otherwise than to the exoneration of the source or fund from which it was derived." (Italics added.)

I am accordingly satisfied that, under the law of South Carolina, in conformity with the general rule, that if the source of the funds from which the several pay-

States to Use of Jackson Ornamental Iron & Bronze Works v. Brent (D.C. S.C.1916) 236 F. 771, 774, the Court said: "Payment, once made and applied, cannot be recalled and otherwise applied without the consent of the surety" involved. See, also, Columbia Digger Co. v. Rector, *supra,* at p. 628, 215 F.; Annotations, 21 A.L.R. 712 and 57 A.L.R. 2d 865.

5. That the law does not require such proof of the "exact money" or the "identical money", see, Crane Co., U. S. for Use

and Benefit of v. Johnson, Smathers & Rollins, *supra,* at p. 123, 67 F.2d. Commenting on this case, the Court in St. Paul Fire and Marine Insurance Co. v. United States for Use of Dakota Electric Supply Co., *supra,* at p. 30, 309 F.2d, remarked, "The Fourth Circuit in Johnson speaks with particularity of 'The proceeds or fruits of the very contract, business, or transaction covered by the obligation of the surety' and does not restrict its observations to 'identical money'."

ments were made to American was not, within the knowledge, actual or constructive, of American, from the Lexington contract, then Great American is not entitled to any credits against the account proved by American.

The surety Great American has conceded on argument [6] that only three payments to American can be traced to the Lexington contract.[7] It admits that ten other payments made during the currency of the Lexington contract cannot be so traced.

The theory upon which Great American predicates its claim of tracing is that, immediately prior to these payments, made in August, September and December, Brown had received advances upon the Lexington project and that it must be assumed, therefore, that the payments to American were made from such advances. Thus, the payment to American in August in the sum of $16,656.83 was made on exactly the same day that Brown received an advance on the Lexington project in an amount of $104,797.30. Similarly, in September, Brown's sole advance payment was on the Lexington project and it is to be assumed, therefore, that the payment made to American by Brown subsequently in that month was from the Lexington advance. In December, however, Brown collected advances on four projects. The Lexington advance was received three days before the payment by Brown to American, and the Richmond advance one day before such payment. The advance on the Scotland project was some two weeks after the payment to American. Under Great American's theory of tracing, it is not permissible to assign the payment made by Brown on December 13 to the Lexington project as distinguished from the Richmond project. In sum, accepting the surety's method of tracing and recognizing that "identical money" tracing is not required, it would seem that only the August and September ber payments had their origin in advances made on the Lexington project.

 Even if it be argued that the two payments made in August and September arose out of advances made on account of the Lexington project, there remains the question of American's knowledge, actual or constructive, of such source. Mere proof of the source of the funds does not authorize a reallocation of a payment, different from that made by the parties; either knowledge, or reason to know, the source on the part of the creditor is required for reallocation. Koehring Company v. United States, etc., *supra*, at p. 470, 303 F.2d; United States for Use and Benefit of Wolther v. New Hampshire Fire Insurance Company (D.C.N.Y.1959) 173 F.Supp. 529, 537–538.

In most of the cases in which a reallocation of payments for the benefit of a surety has been ordered, the creditor concededly knew the source of the payment. In the *Franchi Bros.* and *Beck Cases,* for instance, it was admitted that the creditor knew the source of the payment. In both the *Grubb* and *Farnsworth Cases,* the creditors had access to the debtor's books and were supplied with copies of the "progress payments as they came due". In the *St. Paul Case,* the creditor was found actually to have "effective control" of the debtor and thus had to know the source of payments made by the debtor. In the *Graybar Electric Case,* payments were actually made jointly to the creditor and debtor in order, as the creditor knew, to assure the receipt by the creditor of the amount due him. And in the *Crane Case,* the Court, in sustaining the submission of the issue of knowledge to the jury, said that "there was substantial evidence tending to show that it (the creditor) had such knowledge "of the source of the fund."

 There is not in this case, on the other hand, any admission that the cred-

6. See Findings 10 and 11 of Great American's Proposed Findings of Fact.

7. These three payments are: August 12, 1966 $16,656.83, September 13, 1966 $16,082.07 and December 13, 1966 $8,252.51.

itor knew the actual source of the payment. There is no "substantial evidence" of such knowledge. The creditor had no access to the books of the debtor. It apparently made no inquiries, and had no knowledge about specific progress payments. Actually, if it had had access to the books of the debtor—as Great American has had—and if it applied Great American's method of tracing, American would only have been able to trace two of the payments received by it to the Lexington project. There were thirteen payments to American during the period in question. Eleven of those, Great American admits, could not be traced to the Lexington project; the creditor could not, therefore, any more than the surety, be charged with knowledge, actual or constructive, that the source of these eleven payments was the Lexington project. What was different, so far as the creditor's knowledge is concerned, between those eleven payments and the two payments, of which Great American asserts the creditor should be charged with knowledge of the source? The Court can see none. The knowledge of source was the same in the case of all thirteen payments.

It is, of course, true that American knew that Brown was receiving progress payments on the Lexington project just as it knew that Brown was receiving progress payments on some seven or eight other similar public projects. To that extent, American knew that some of the payments made by Brown to its creditors, including American, derived, in part at least, from advances received on the Lexington project. Whether a particular payment could, in whole or in part, be traced to Lexington, as distinguished from one or more of the other projects on which Brown was engaged was not, however, evident or known to American.

■■ Does the mere fact that a creditor knows that some of a debtor's source of funds is from a contract secured by a payment bond amount to constructive knowledge on the part of the creditor that every payment the latter receives is

to be deemed to result from the proceeds of that contract? To so hold would mean that, in every case where a debtor is engaged in work under a contract secured by a payment bond, the creditor must, in protection of the surety, assure himself of the source of every payment before giving credit therefor. In the case of a contractor such as Brown, engaged simultaneously on a score or more of public contracts, such a rule would impose on a creditor, who wished to protect himself as to all payments received, a duty of actually policing the contractor's disbursements. Such exacting scrutiny I do not conceive to be required. Business transactions are not to be thus unreasonably fettered; commercial transactions are not to be so clogged. See, Utah State Building Comm., etc. v. Great American Ind. Co. (1943) 105 Utah 11, 140 P.2d 763, 770. The true rule seems to me to be that, in the absence of anything appearing to show the source of payment, the creditor is entitled to follow the debtor's instruction as to application. The creditor is not required to make specific inquiries; it is under no duty to investigate the source of the payment before applying the same. Any other rule would really make the materialman, for whose benefit the payment bond is required, become a surety for the surety and would transform the payment bond from a source of protection for the materialman into a snare; it would represent a perversion of the very purpose sought to be achieved by the payment bond.

■ It may be said that some significance should be attached to the fact that the debtor instructed that the payments should be applied to the oldest outstanding monthly account. The answer to this, however, is that, as we have seen, when there is a current account such as that between American and Brown, the normal method for applying payments is to the oldest outstanding items. See, Wardlaw v. Troy Oil Mill, *supra*, ('74 S.C. 368, 371, 54 S.E. 658). When, therefore, Brown instructed, and American complied by applying all payments to the

oldest outstanding monthly account, both were following normal practice and no inference of impropriety is thereby warranted.

Great American seeks with considerable skill to integrate what it claims was the knowledge of American's credit manager of dates of payment of progress advances on the Lexington project with that of the sales manager as to dates of payment and, from the composite knowledge of the two, build up a conclusion of knowledge of the source of the payments on the part of American. See, Copeman Laboratories Co. v. General Motors Corp. (D.C.Mich.1941) 36 F.Supp. 755, 762. The difficulty is that neither the sales manager nor the credit manager had the knowledge claimed for them by the surety. The sales manager did not testify that he knew when Brown received his advance payments on the Lexington project or on any of the other projects on which Brown was engaged. He knew that normally road contractors engaged on public contracts in North and South Carolina submit "around the first of the month" monthly estimates on which they request advance payments. He disclaimed, however, any knowledge whatsoever when Brown received advance payments on the monthly estimates which he filed.[8] This testimony of the salesman is not contradicted. The foundation of fact, upon which the surety seeks to erect his premise of knowledge on the part of American, thus just doesn't exist.

█ In my opinion, this case is similar to Broward County Florida Comm. for Use and Benefit of General Electric Supply Co. v. Continental Cas. Co., supra (243 F.Supp. 118). The facts are almost identical. The relationship between the creditors and the debtor was similar to that between Brown and American. Payments were made in the same manner. Just as it was held in that case that there was an absence of any

proof of knowledge, actual or constructive, of the source of the payments, so it must be held here.

United States Casualty Company v. Noland Company, supra (286 F.Supp. 333), has special features which clearly distinguish it from this case. Before the surety agreed to issue its bond, it inquired of the creditor the method of payment of its accounts with the contractor. It replied "job basis", meaning that payments on specific jobs were made as advances were received on those specific jobs. Actually, though, the debtor was not "fulfilling existing commitments" and was not applying payments on a "job basis" as the supplier-creditor had represented was its agreed method of collection. The Court accordingly found that the creditor had "reason to know that the funds being paid on the old accounts had a source distinct from the job giving rise to the old account." (p. 336). No such situation was presented in this case.

█ Both parties adverted to the possibility of an equitable estoppel in their favor. The record, however, is insufficient to support such a claim by either. Thus, it is not evident in the record that American knew of the demand by the surety for a reallocation of the payments credited to the Scotland project when American made settlement with the surety on the Scotland project; in fact, American contends with some justification that, by inference, the record is to the contrary. Without proof of such knowledge by American, no basis for an estoppel in favor of Great American could arise. On the other hand, any right to an estoppel in favor of American would have to rest on evidence that Great American, knowing that American was proceeding to settle with the surety on the Scotland project, remained silent when fair dealings required it to speak and did not advise the materialman of its

---

8. Pupa, the salesman, testified (p. 29, Transcript), "I didn't know when he (Brown) got the estimate." Again, at p. 34 of the Transcript, Pupa testified: "I know that North and South Carolina pay estimates once a month, and what dates they are, I don't know. That's just—everybody knows—I mean, everybody in the trade knows that estimates are paid once a month."

intention to demand a reallocation of payments theretofore credited by the materialman to the Scotland project. The record, again, is barren of a basis for such finding.

## CONCLUSIONS OF LAW

1. The plaintiff had the right to make the allocation of payments received by it from Brown as it did.

2. The defendant surety is not entitled to a reallocation of any of the payments to the account for which the surety, under its Lexington bond, is obligated.

3. The plaintiff is entitled to judgment against the defendant Great American Insurance Company in the sum of $106,953.54, with interest from date of demand upon the surety.

Let judgment be entered accordingly.

And it is so ordered.