**TRANS–AMERICAN STEEL CORP.,**
Plaintiff-Appellee,

v.

**J. RICH STEERS, INC., a New York Corporation, et al., Defendants,**

**Aetna Casualty & Surety Company,**
**Defendant-Appellant.**

No. 80–7336.

United States Court of Appeals,
Fifth Circuit.*
Unit B

March 15, 1982.

---

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Smith, Cohen, Ringel, Kohler & Martin, Kenneth L. Millwood, Atlanta, Ga., for defendant-appellant.

Stokes & Shapiro, Herman L. Fussell, Charles V. Choyce, Jr., Atlanta, Ga., for plaintiff-appellee.

Before TJOFLAT, HATCHETT and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

Trans-American Steel Corporation (TASCO), plaintiff-appellee, brought suit in the district court on a payment bond against defendant-appellant, Aetna Casualty and Surety Company (Aetna). Judgment was entered after a jury verdict in favor of TASCO. Aetna appeals from this judgment, contending that the district court erred by failing to give certain requested instructions in its charge to the jury. We affirm.

J. Rich Steers, Inc. (Steers) was the general contractor for the construction of the Georgia State train station in Atlanta for the Metropolitan Atlanta Rapid Transit Authority (MARTA). This construction project was designated as MARTA Project CE–120. As required by Georgia law,[1]

---

1. Ga.Code Ann. § 23–1705 provides in pertinent part:

No contract with this State, a county municipal corporation, or any other public board

Steers posted a payment bond for the project. Steers was the principal and Aetna was surety on the payment bond.

On May 27, 1977, B&W Steel Erectors, Inc. (B&W) entered into a contract with Steers to erect steel as a Steers subcontractor on Project CE–120. B&W also was a Steers subcontractor on a non-MARTA project, the State of Georgia Twin Office Towers, which was designated as Project GBA–39Y. On June 3, 1977, B&W entered into a contract with TASCO under which TASCO was to supply steel for B&W's work on Project CE–120. On the same date, B&W and TASCO entered into a similar but separate agreement for TASCO to supply steel for B&W's work on Project GBA–39Y.

TASCO made deliveries to B&W on Project CE–120 from August 1977 through December 1977. B&W remained current in its indebtedness to TASCO during this time. On December 31, 1977, however, B&W defaulted on its obligations to TASCO. Following its default, B&W continued to work on Project CE–120. Pursuant to Georgia law, TASCO gave notice of B&W's default to Steers and Aetna on February 27, 1978, and demanded payment under the payment bond.[2] Upon receipt of this notice, Steers ceased all payments to B&W. Between December 31, 1977, and the time payments were ceased, however, Steers had paid B&W $117,706.98, possibly for work on Project CE–120, although this is not clear from the record. On direct examination, James Bryce, office manager for J. Rich Steers, Inc., asserted that the $117,706.98 payment was for work by B&W on Project CE–120. On cross-examination, however, Mr. Bryce testified that Steers had three jobs ongoing with B&W at the time and that it was not possible to tell from the checks the project for which they were issued. In addition, Steers was unable to produce the ledger cards for Project CE–120, which presumably would have made clear whether the $117,706.98 was paid for work on Project CE–120.

In January 1978, B&W issued a check to TASCO in the amount of $50,000. In February 1978, B&W issued a second check to TASCO in the amount of $40,965.71. Neither check referred to Project CE–120, nor

---

or body thereof, for the doing of any public work shall be valid for any purpose, unless the contractor shall give:

. . . . .

(2) A payment bond with good and sufficient surety or sureties, payable to the State, county, municipal corporation, or public board or body thereof for which the work is to be done, and for the use and protection of all subcontractors and all persons supplying labor, materials, machinery, and equipment in the prosecution of the work provided for in said contract. The payment bond shall be in the amount of at least the total amount payable by the terms of the contract.

**2.** Ga.Code Ann. § 23–1708 provides in relevant part:

2. Every person entitled to the protection of the payment bond required to be given under section 23–1705, and who has not been paid in full for ... material furnished in the prosecution of the work referred to in said bond before the expiration of a period of 90 days after the day on which the last of the ... material ... was furnished or supplied by him for which such claim is made ... shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of the commencement of such action and to prosecute such action to final execution and judgment for the sum or sums due him: *Provided, however that any person having direct contractual relationship with a subcontractor, but no contractual relationship express or implied with the contractor furnishing said payment bond, shall have the right of action upon the said payment bond upon giving written notice to said contractor within 90 days from the day on which such person ... furnished the last of the material ... for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied ...: Provided, further, that nothing contained herein shall limit the right of action to said 90-day period. Notice may be served by depositing a notice, registered mail, postage prepaid, duly addressed to the contractor at any place he maintains an office or conducts his business, or his residence, in any post office or branch post office or any letter box under the control of the Post Office Department ....*
(Emphasis supplied.) TASCO's notice to Steers and Aetna complied fully with the statutory requirements.

did either check indicate any specific account to which it should be applied. TASCO applied the proceeds from these checks to B&W accounts other than Project CE–120, one of which was the account for Project GBA–39Y. The amount applied to Project GBA–39Y, $11,484.62, thus was credited to a Steers-related account.

On April 21, 1978, TASCO filed a diversity suit in federal district court against B&W, Steers, and Aetna seeking payment for the balance due on B&W's account for steel supplied for Project CE–120. TASCO sought recovery against Steers and Aetna under the terms of the payment bond. TASCO obtained summary judgment against B&W for the full debt due but was denied summary judgment against Steers and Aetna.

TASCO's claims against Steers and Aetna were tried before a jury in March 1980. At trial, Aetna requested the court to instruct the jury severally (1) that when a creditor receives funds that he knows or should know come from a general contractor on a bonded public construction project, the creditor is required to apply those funds to the account maintained for that project,[3] (2) that a creditor has a duty to determine the source of funds used by its debtor to make payments and to allocate payments received to the proper accounts, and that if the jury found that TASCO failed to exercise that duty, then the jury should find for Aetna,[4] and (3) that if TASCO failed to credit any payments from B&W to the CE–120 account, then TASCO's recovery, if any,

must be reduced by the amount of such payments.[5] The trial court refused to give any of the three requested instructions.

The jury found no liability on the part of Steers, but returned a verdict in favor of TASCO against Aetna on the payment bond claim in the amount of $123,350.03 plus interest in the amount of $16,959.51. Aetna appeals from the judgment entered upon the jury verdict, presenting us with the question whether the trial court committed reversible error by failing to give the requested instructions.

 We begin by addressing Aetna's contention that this case is governed by federal contracts law rather than by Georgia law. In support of its position, Aetna claims that terms of the contract between MARTA and Steers reflected those parties' intention that federal law should govern all questions arising under that contract, and that these terms should be interpreted to mean that federal contracts law should govern disputes between Aetna and TASCO on the payment bond. By this argument Aetna seeks to inject into this case certain federal court decisions interpreting the Miller Act, 40 U.S.C. § 270a *et seq.*, under which the federal courts have imposed upon suppliers seeking the protection of the Miller Act payment bond a duty to allocate payments when the supplier knows or should know the source of those payments. *See, e.g., Graybar Electric Co. v. John A. Volpe Construction Co.*, 387 F.2d 55 (5th Cir. 1967). We note first that the contract between MARTA and Steers does not ap-

---

3. Aetna's Request to Charge No. 2 was as follows:

Members of the jury, I charge you that when a creditor, such as the Plaintiff in this case, receives funds that he knows or should know comes from a general contractor on a public construction project which is the subject of a payment bond, such as the project in this case, the creditor is required to apply those funds to the account it maintains for the project which is the subject of the payment bond.

4. Aetna's Request to Charge No. 3 was as follows:

Members of the jury, I instruct you that the Plaintiff, as a creditor of B&W Steel Erectors, had a duty to determine the source of the

funds being used by B&W to make payments and to allocate payments being received to the proper accounts. If you find that the Plaintiff failed to exercise that duty then, in that event, you should find for the Defendant and against the Plaintiff.

5. Aetna's Request to Charge No. 4 was as follows:

Members of the jury, I instruct you that if you find the Plaintiff has failed to credit certain payments from B&W to its account for Project CE–120 at issue here, then any recovery you feel that the Plaintiff is entitled to must be reduced by the amount of such payments.

pear in the record and thus cannot be considered by this court on appeal. Moreover, the intentions of MARTA and Steers regarding the law to be applied in disputes arising from their contract cannot be transported to others, such as TASCO, who were not party to that contract. The contract between TASCO and B&W makes no mention of an intention to have federal law apply, and neither does the contract between B&W and Steers. We conclude that Georgia law applies in this case. We have discussed this contention only because appellant's brief placed such great importance upon it. As will become apparent later on, disposition of this case does not turn on whether Georgia or federal law controls because the evidence does not support Aetna's first requested instruction and the second and third requested instructions do not accurately state either federal or Georgia law.

We now turn to Aetna's contentions that the trial court erroneously failed to give the instructions requested by Aetna. "To effectively charge a trial court with failure to provide an instruction, one must first show the presence of evidence in the record sufficient to support submission of that instruction.... Absent such evidence, nothing is present upon which the court could have based the refused instructions." *Bucyrus-Erie Co. v. General Products*, 643 F.2d 413, 420 (6th Cir. 1981); *Hartman v. Miller Hydro Co.*, 499 F.2d 191, 193 (10th Cir. 1974). Thus, our initial inquiry is whether the record presents facts sufficient to support the submission of Aetna's requested instructions.

As for the first requested instruction—that a creditor who knows or should know that the source of payments is a general contractor on a bonded public construction project must apply those payments to the account maintained for that project—we find no evidence in the record to support its submission. Aetna points to

the following facts in support of its position: that TASCO was a creditor of B&W; that B&W had several accounts with TASCO, each one corresponding to a particular contract that B&W had with a general contractor for a construction project in Atlanta; that one of those accounts, the one sued upon in this case, related to B&W's subcontract with Steers for construction of the Georgia State train station for MARTA, known as Project CE–120; that TASCO knew that Project CE–120 was covered by Aetna's surety bond; that as Steers made payments to B&W, B&W would make payments to TASCO; and that the evidence discloses only one source of revenue for B&W during January and February 1978, that being the $117,706.98 payment from Steers. These facts simply establish that TASCO knew that some of the payments made by B&W had as their source payments to B&W by Steers for work on Project CE–120. To justify giving the instruction in question, however, evidence would have to exist showing not only that the source of the payments in question—*i.e.*, the $50,000 and the $40,965.71 payments—was payments made by Steers to B&W for work on Project CE–120, but also that TASCO either knew or should have known that this was the source of those particular payments. Aetna has failed to refer us to any such evidence in the record, and our own review of the record does not disclose such evidence either. To the contrary, the evidence shows that Steers itself was not sure whether the $117,706.98 payments made in January and February 1978 were for Project CE–120 or for some other project. For the foregoing reasons, we conclude that Aetna's first requested instruction was not supported by any evidence of record and that the trial court did not err by failing to include the instruction in its charge to the jury. In so holding, we express no opinion on the question whether the requested instruction accurately states the law of Georgia.[6]

6. We note, however, that the general rule in Georgia is that, in the absence of a direction to the contrary by the debtor, a creditor holding several demands against the debtor has the right to credit payments as he sees fit. This rule is contained in Ga.Code Ann. § 20–1006, which provides as follows:

Analysis of Aetna's second requested instruction—that a creditor has a duty to determine the source of funds used by its debtor to make payments and to allocate payments to the proper accounts—requires us to determine whether the instruction is an accurate statement of the law of Georgia, for the evidence is clear that TASCO failed to discharge that duty if it in fact exists. Before discussing the law governing the second requested instruction, we wish to point out that Aetna's brief does not separate its argument and case citations regarding the second instruction from that regarding the first instruction. Aetna bases its argument that a materialman is under a duty to inquire about the source of the subcontractor's payments solely on cases involving the duty to allocate placed upon a materialman who knows or should have known the source of the subcontractor's payments. This is reflected by the following excerpts from appellant's brief:

> The question, therefore, is whether TASCO had the duty to inquire about the source of B&W's payments and to allocate those payments among B&W's various accounts accordingly. (Appellant's Brief p. 14.)

> . . . . .

> The federal courts, including the Fifth Circuit, have imposed the duty of inquiry and the corresponding duty of application of payments on suppliers who seek the

protection of the Miller Act payment bond. (Appellant's Brief p. 16.)

Aetna then cites several federal cases including *Graybar Electric Company, Inc. v. John A. Volpe Construction Co.*, 387 F.2d 55 (5th Cir. 1967),[7] from which the following language is quoted:

> The rule is clear that, when a creditor comes into possession of funds under circumstances that he knows or is chargeable with knowledge that all or a portion of the source of such funds is from a general contractor on a public project, the creditor is bound to apply such funds to the job account of the principal or general contractor notwithstanding any directions he may receive from his payor.

387 F.2d at 59 (footnotes omitted). Notwithstanding the fact that federal law does not govern this case, *Graybar* and the other federal cases cited by Aetna provide no support whatsoever for the instruction requested. All these cases involve the duty to allocate placed upon a creditor who knows or should have known the source of the debtor's payments, but not one of these cases even intimates that a creditor is under a duty to inquire as to the source of a debtor's payments. In fact, one case cited at trial by Aetna, *American Oil Co. v. Brown Paving Co.*, 298 F.Supp. 528 (D.S.C. 1969), expressly declares that no such duty exists.[8] From the foregoing it can be seen

When a payment is made by a debtor to a creditor holding several demands against him, the debtor has the right to direct the claim to which it shall be appropriated. If he fails to do so, the creditor has the right to appropriate at his election. If neither exercises this privilege, the law will direct the application in such manner as is reasonable and equitable, both as to parties and third persons. As a general rule, the oldest lien and the oldest item in an account will be first paid, the presumption of law being that such is the fair intention of the parties.

The Georgia courts apparently have never addressed the question whether § 20–1006 is subject to an exception where one of the debtor's accounts involves a public construction project subject to a payment bond required by Ga.Code Ann. § 23–1705.

**7.** Aetna also relies upon *St. Paul Fire & Marine Ins. Co. v. United States ex rel. Dakota Electric Supply Co.*, 309 F.2d 22 (8th Cir. 1962), *cert.*

*denied*, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963); *Koehring Company v. United States ex rel. Hoover Equipment Co.*, 303 F.2d 468 (10th Cir. 1962); *United States ex rel. Carroll v. Beck*, 151 F.2d 964 (6th Cir. 1945); *R. P. Farnsworth & Co. v. Electrical Supply Co.*, 112 F.2d 150 (5th Cir.), *cert. denied*, 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454 (1940); and *United States ex rel. Crane Co. v. Johnson, Smathers & Rollins*, 67 F.2d 121 (4th Cir. 1933).

**8.** Does the mere fact that a creditor knows that some of a debtor's source of funds is from a contract secured by a payment bond amount to constructive knowledge on the part of the creditor that every payment the latter receives is to be deemed to result from the proceeds of that contract? To so hold would mean that, in every case where a debtor is engaged in work under a contract secured by a payment bond, the creditor must, in protection of the surety, assure himself of

**564**

that Aetna attempts to convert a rule requiring action on the part of a creditor when he "knows or should have known" into a duty on the part of the creditor to make inquiry.

 In turning to Georgia law on the subject and referring us to *Daniel v. Dixie Plumbing Supply Company*, 112 Ga.App. 427, 145 S.E.2d 796 (1965), Aetna makes the following assertion in its brief which undercuts its requested instruction to the effect that a materialman has a duty to make inquiry:

> The [*Daniel*] court also declined to impose a duty of allocation when the source of payments is unknown. The court, however, neither rejected nor approved a rule requiring allocation where the creditor knows the source of the payments.

Aetna has not cited any controlling cases or statutes that place a duty on a creditor to inquire as to the source of the debtor's payments whether a public contract is involved or not. Thus, we must conclude that the instruction does not accurately state the law and was properly refused by the trial court.

▇ Aetna's third requested instruction was that TASCO's recovery must be reduced by the amount of any payments that it failed to credit to the CE–120 account. This statement would be accurate only if TASCO was under a duty to make inquiry and allocate. Because we already have determined that no such duty was upon TASCO, this instruction was properly refused by the trial court as well.

---

the source of every payment before giving credit therefor. In the case of a contractor such as Brown, engaged simultaneously on a score or more of public contracts, such a rule would impose on a creditor, who wished to protect himself as to all payments received, a duty of actually policing the contractor's disbursements. Such exacting scrutiny I do not conceive to be required. Business transactions are not to be thus unreasonably fettered; commercial transactions are not to be so clogged. See, *Utah State Building Comm., etc. v. Great American Ind. Co.* (1943) 105 Utah 11, 140 P.2d 763, 770. The true rule seems to me to be that, in the absence of anything appearing to show the source of

For the reasons expressed in this opinion, the judgment below is

AFFIRMED.

---

payment, the creditor is entitled to follow the debtor's instruction as to application. *The creditor is not required to make specific inquiries; it is under no duty to investigate the source of the payment before applying the same.* Any other rule would really make the materialman, for whose benefit the payment bond is required, become a surety for the surety and would transform the payment bond from a source of protection for the materialman into a snare; it would represent a perversion of the very purpose sought to be achieved by the payment bond. *American Oil Co. v. Brown Paving Co.*, 298 F.Supp. 528, 538 (D.S.C.1969) (emphasis added).