UNITED STATES for the Use and Benefit of JINKS LUMBER COMPANY, INC., Plaintiff-Appellant,

v.

FEDERAL INSURANCE COMPANY et al., Defendants-Appellees,

Charles Register and Robert B. Staats, Trustee, Defendants-Appellants.

No. 72–2754.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1973.

---

Jerry W. Gerde, Panama City, Fla., for Jinks Lumber Co., Inc.

Robert B. Staats, Panama City, Fla., for Register and trustee.

Gary Lane, Pensacola, Fla., for Federal Ins. Co. and Dyson & Co.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

This suit was brought under the Miller Act (40 U.S.C. § 270a et seq.) by Jinks Lumber Company, Inc., use-plaintiff, against Dyson & Company, a general contractor, and its surety Federal Insurance Company, to recover the unpaid balance of $11,202.79 for building materials (wallboard) furnished to Charles Register, a subcontractor who was also named a defendant. Register, therefore, became a ，bankrupt and the Trustee in Bankruptcy was substituted in his place and filed a cross-claim against Dyson for additional amounts alleged to be due the subcontractor. The district judge in a nonjury trial held that Jinks was estopped from asserting its claim against Dyson for nonpayment of materials furnished to Register; and further held that the Trustee for Register had not sustained his burden of proof and had shown "no wrongful conduct on the part of Dyson" which would support recovery of its claim.

## I.

### The Jinks Claim

Dyson was the general contractor under a government contract providing for construction of housing units at an Air Force base at Panama City, Florida.

Register was both the wallboard and painting subcontractor, under separate subcontracts, on the job. The wallboard was furnished to the subcontractor by Jinks.

Register was unable, because of apparent financial inability, to furnish a performance bond and at Dyson's insistence an arrangement was made whereby all funds due under the wallboard subcontract would be paid by Dyson in progress payment checks issued jointly to Register and Jinks. Letters were exchanged between Register and Dyson and it was agreed that Jinks would furnish copies of invoices and each monthly statement of the Register account to Dyson.[1]

Jinks began furnishing materials to Register to be used on Dyson's Air Force job in April 1969 and continued until October 1969.

Jinks' practice was to close its billing at the end of the business day of the 25th of each month and send its customer a statement which would be due and

---

[1]. Register's letter to Dyson is as follows:

"March 10, 1969

"Dyson and Company
P.O. Drawer F
Pensacola, Florida

"Job Data
Job No. F08637–69–C–0070

"Dear Sir,

"I request that all payments for the Drywall Contract, on this job be made jointly to Jinks Lumber Company and Charles Register.

"Sincerely,
ag        /s/ Charles Register
Charles Register"

Dyson's letter to Register, copy to Jinks, is as follows:

"March 21, 1969

"Charles 'Chuck' Register
Paint Contractor
P.O. Box 919
Panama City, Florida

"Re: 160 Family Housing Units
Tyndall AFB, Florida

"Dear Chuck:

"This will acknowledge receipt of your letter of March 10, 1969 in which you requested that checks covering all of your payments for the Drywall Contract be made jointly to your firm and Jinks Lumber Company.

"We are agreeable to this arrangement; however, we would like it understood that payments made under this subcontract are to be applied to your account for this particular project and not intermingled with your account for any other project. In order for us to be aware of the status of this account at all times, we would appreciate Jinks Lumber Company sending copies of all invoices and each monthly statement directly to this office. We do not believe this will be too much of an inconvenience to Jinks as there probably won't be too much activity each month.

"We trust this meets with your approval.

"Very truly yours,
DYSON & COMPANY
/s/        RB
Roy Brewton

RB:JP
Enclosure:
Copy of your letter dated March 10.
cc: Jinks Lumber Company"

Jinks and Register's joint letter agreement, copy to Dyson, is as follows:

"April 1, 1969

"Mr. Charles 'Chuck' Register
127 N. Cove Terrace Drive
P.O. Box 919
Panama City, Florida 32401

"Re: 160 Family Housing Units
Tyndall AFB, Florida

"Dear Sir:

"This is in agreement with JINKS LUMBER COMPANY and Charles 'Chuck' Register, Sheetrock Contractor, to furnish at the following prices materials as listed below:

'A' ½" Regular        $45.00
'B' ⅝" Regular         53.00
'C' ⅝" Fire Code        60.70

"These prices include Sheetrock delivered to jobsite and set off as close to the building as possible. Also, agreement to be made by 'Chuck' Register to use fork-lift to unload sheetrock on job with no unnecessary tie-up in Jink's trucks.

"Payment for sheetrock, accessories and labor will be made jointly to Jinks Lumber Company and Charles Register, with payment being made every 30 days for material purchased.

"SIGNED: Jerry Pybus
Jerry Pybus, Mgr.
Jinks Lbr. Co.
Charles Register
Charles 'Chuck' Register,
Contractor

JP/os
cc: Dyson & Company"

payable by the 10th of the following month. Both Register and Dyson received these monthly statements. The manner in which progress payment checks issued by Dyson were handled thereafter is critical to a determination of whether the district judge correctly ruled that Jinks was estopped to enforce its claim for the unpaid balance of materials furnished to Register and used on the Air Force job. It is conceded that *all* amounts due Register under its wallboard subcontract with Dyson were paid in checks jointly payable to Register and Jinks. The Jinks position is that when such jointly payable checks were presented to it by Register, it took out all amounts *then due* and owing by Register and gave him the balance of the proceeds.

At the close of business on July 25, 1969, Register's account with Jinks for materials supplied amounted to the sum of $5,153.81. The July monthly statement was then mailed to Register and Dyson showing that indebtedness and on July 29, 1969, Register paid $1,534.46 of his own funds to Jinks on account. Dyson then issued its first of three checks on account of the wallboard subcontract dated July 29, 1969, for $12,005.98 jointly payable to Register and Jinks. Sometime prior to the 10th of the following month, this check was brought by Register to Jinks which held out the sum of $3,619.35 thereof, thus paying the July account in full, and Jinks turned over the balance to Register. During the day on August 25, 1969, the second Dyson check for $9,935.10 jointly payable to Register and Jinks was endorsed by Jinks and turned over to Register since at that time Register's account with Jinks was current. Jinks' books were then closed at the end of the business day on August 25 and thereafter the August monthly statement was mailed to Register, copy to Dyson, showing a current balance due of

$9,379.63. The third Dyson check dated September 10, 1969 jointly payable to Register and Jinks was for $9,187.29, and Jinks retained all of the proceeds thereof to apply on the Register account. The three Dyson checks payable jointly to Register and Jinks totaled $31,128.37. Materials furnished by Jinks to Register for the Dyson Air Force job, according to Mr. Pybus, Jinks' executive vice-president, totaled $31,987.54.

The district court held that the total of the three checks issued by Dyson jointly payable to Register and Jinks was equal to the total of materials supplied by Jinks and that if Jinks had retained all of these funds and applied them to Register's account Jinks would not only have been paid in full, it would have been overpaid.[2]

We cannot agree with the court below that Jinks was estopped under the facts set forth to claim the balance due on its account. The joint payment procedure was initiated by Dyson because Register could not furnish a performance bond, and to insure payments to Jinks. But Jinks withheld such portion of the proceeds of the Dyson checks as was necessary to pay the amounts *then due* by Register under Jinks' practice of closing its books at the close of business on the 25th of each month and payment being due by the 10th of the following month. This billing procedure is said by Jinks to be standard in industry at Panama City. That seems undisputed. Obviously Register required some portion of the proceeds since Dyson was issuing jointly payable checks to Register and Jinks for *all* amounts due during the progress of the job under the wallboard subcontract. For example, when Jinks endorsed and turned over to Register during the day of August 25, 1969, the Dyson check of that date for $9,935.-10, the transcript shows that Register put the proceeds in the Commercial

2. The district judge in his written opinion said that the materials supplied totaled approximately $29,000 whereas Mr. Py-bus' testimony showed the total to be $31,987.54.

Bank and "started paying people with it or continued to pay them with it," including some notes due the Commercial Bank.[3]

The trial court's citation of Graybar Electric Co. v. John A. Volpe Construction Co., 5 Cir., 1967, 387 F.2d 55, in rejecting Jinks' claim is inapposite. We do not have a *Graybar* case here. In *Graybar,* a Miller Act case, the contractor did everything it reasonably could to protect itself to prevent diversion of funds intended for payment of building materials. But *Graybar* misrepresented and overstated to the general contractor the amount of its current balance with the subcontractor. *Graybar* also falsely represented to the general contractor that the jointly payable checks would be endorsed over to *Graybar* for payment of materials supplied and in course of delivery, whereas in fact the checks were endorsed over by *Graybar* to the subcontractor. Thus the general contractor relied on *Graybar's* representations to its prejudice and the subcontractor was able to obtain large sums from the general contractor by *Graybar's* endorsement of the jointly payable checks to the subcontractor, unknown to the general contractor.

In Moyer v. United States, 4 Cir., 1953, 206 F.2d 57, a Miller Act case, the materialman supplied false receipts to the subcontractor who in turn forwarded them to the general contractor. But estoppel was denied by the court because the general contractor made no payments in reliance on the receipts and had suffered no detriment.

*See also* United States for use of Clark-Fontana Paint Co. v. Glassman Construction Co., 4 Cir., 1968, 397 F.2d 8, in which the court held that a materi-

alman who had not deducted his current due from each jointly payable check did not lose his statutory rights under the Miller Act.

In United States for use of Friedrich Refrigerators, Inc. v. Forrester, 5 Cir., 1971, 441 F.2d 779, another Miller Act case involving a claim of a materialman against the general contractor for materials supplied to a subcontractor, we commented favorably on the Fourth Circuit's holding in *Glassman, supra,* as follows:

"A similar result was reached in *Glassman,* supra. There, the prime contractor had issued checks in sufficient number and amount to cover the cost of the material supplied by the materialman prior to the subcontractor's default. However, because the subcontractor was having difficulties in meeting its expenses, the materialman had allowed the subcontractor to retain more than its proportionate share of the joint checks. Following the subcontractor's default, a Miller Act suit was initiated by the materialman. Despite the asserted defenses of waiver, estoppel and payment, the Fourth Circuit allowed the materialman to recover the difference between the amount the materialman actually retained from the joint checks and the cost of the material delivered."

*Id.* 441 F.2d at 783.

We hold, therefore, that Jinks was not estopped. It withheld the proceeds of the Dyson jointly payable checks to the extent of amounts then due by Register, supplied copies of the monthly statements to Dyson of the Register account which showed the manner in which the account was being handled and prior payments credited, was guilty of no mis-

---

3. The trial court found that application of any portion of these funds to Register's preexisting indebtedness with the Commercial Bank was improper, and that payments to Register and Jinks jointly should have been applied to Jinks' account only. But this was neither feasible nor practical with *all* of the progress payments due Register on the wallboard subcontract being made in jointly payable checks, leaving nothing for Register's labor or other expenses. Jinks' actions in applying proceeds to the amounts due and payable at the time the checks were obtained was proper under the circumstances.

representation or false invoices as in *Graybar, supra,* and should recover the balance admittedly unpaid for the furnishing of wallboard installed on the Air Force job. It would be unrealistic to expect that under the circumstances all of the proceeds due Register under his wallboard subcontract would be applied solely to the Jinks materials account. Dyson was not misled to its prejudice by Jinks.

## II.

### Trustee in Bankruptcy for Register Claim

The district court denied the Trustee's claim against Dyson by holding that the Trustee had not sustained his burden of proof, that the testimony adduced at trial was "sketchy," and that Register's testimony was not corroborated by accurate written records. On the other hand, the court said that the testimony of Dyson's employee, Hall, clearly controverted the position of Register. Finally, the court held that the Trustee had not shown any wrongful conduct on the part of Dyson which would support recovery of damages. Dyson's claim of setoff against Register for completion costs of the painting subcontract of approximately $20,000 was maintained against the amount of $3,428.88 which Dyson conceded it owed Register on that subcontract.

Ordinarily, when questions of fact are involved, we look to the provisions of Rule 52(a), Fed.R.Civ.P., and affirm the trial court's findings of fact unless clearly erroneous. But we are unable to determine from the state of this record and the findings of the district court what a true and correct accounting of the dispute between Register and Dyson would show. We do not have available all of the pertinent facts sufficient to make a proper disposition of the Trustee's claim.

The district court's findings are conclusory and do not analyze the details of any of the contentions of the Trustee for Register as to the amounts claimed to be due by Dyson. We are impressed (at least prima facie) by the Trustee's contention that according to computations testified to by Mr. Hall, Dyson's superintendent on the job, from the records of his company, that as of September 25, 1969, Register had completed 40% of the wallboard contract and 38% of the painting contract which, together with materials stored in place, less 10% retainage, showed a net due Register of $78,681.25, whereas in fact he received payments on his two subcontracts totaling $66,944.10 (this includes credit dated September 24, 1969 of $2,333.65). Dyson responds that Register was not entitled to credit for materials stored, under the circumstances of his alleged default until final completion of the job by others. The district court did not reach or resolve this issue.

Thus, according to the Trustee's contentions (as amended by showing the September 24, 1969 credit), Dyson's records indicate that as of October 13, 1969, Register had completed 62% of the wallboard contract and 51% of the painting contract which, together with stored materials, totaled $115,406.94 against what had been paid, $66,944.10, leaving a balance due Register of $48,462.84.[4] It must be determined when Register's contracts actually terminated. Was it October 2, 1969 when he was unable to pay his own labor; or two weeks later, approximately October 16, 1969, when he finally walked off the job

---

4. The details of the Trustee's amended contentions follow:

| | |
|---|---|
| Wallboard—62% complete ($100,000 x 62%) | $ 62,000.00 |
| Painting—51% complete ($85,000 x 51%) | 43,350.00 |
| Stored materials | 10,056.94 |
| Total | 115,406.94 |
| Less paid to Register (including September 24, 1969 credit of $2,333.65) | 66,944.10 |
| Net claimed to be due Register | $ 48,462.84 |

not to return; or October 20, when Dyson gave him a written termination notice? The percentage of completion must be related to one of these dates in order to determine what was finally due Register. Is Register entitled to claim credit for materials stored, especially if the materials were not paid for? Who actually breached the contract, Dyson or Register? The question is difficult to answer until a factual determination can be made of the state of their account as of the end of September 1969. The district court has maintained a setoff against Register of $20,000 claimed by Dyson as a cost overrun for completing the painting contract. Apparently the wallboard contract was completed for $3,428.88 less than the contract price. Dyson's claim for $20,000 cost overrun against Register is not substantiated in the record and is shown only by the testimony of Richard Werner, Dyson's accounting clerk, who said that it was "approximately $20,000." The setoff cannot be sustained, which is based only upon an approximation and without resort to actual records. True, the testimony of the Trustee through Register is sketchy. But that applies as well to Werner's testimony. The Trustee's claim—if it finally materializes—is made out not by Register's testimony but by the testimony of Dyson's superintendent, Hall, and the documentary evidence supporting the monthly requests for progress payments.

We do not attempt to prejudge the final decision in connection with the Trustee's claim. But it is clear that the case must be remanded for clarification and supplementation of the record as to the questions we have raised herein. Further definite and more specific findings by the trial judge are necessary under the circumstances. The parties should be permitted an opportunity to offer such relevant additional evidence as will afford the district court an opportunity to clarify these issues and make an appropriate disposition thereof. *See* Henning v. Lake Charles Harbor and Terminal District, 5 Cir., 1968, 387 F.2d 264, 266.

Our holding as to the Jinks claim is conclusive and executory upon filing of the mandate herein without the necessity of awaiting further action on the Trustee's claim which is a separate matter, with the tag end of establishing a reasonable attorney's fee for Jinks.

Reversed and remanded.