**UNITED STATES of America, for the Use and Benefit of GENERAL ELECTRIC SUPPLY CO., a division of the General Electric Co., Plaintiff-Appellant,**

v.

**WIRING, INC., et al., Defendants,**

**United States Fidelity & Guaranty Co., et al., Defendants-Appellees.**

**No. 80–7060.**

United States Court of Appeals, Fifth Circuit. Unit B

June 1, 1981. Rehearing Denied Aug. 12, 1981.

Sutherland, Asbill & Brennan, Alfred A. Lindseth, Atlanta, Ga., for plaintiff-appellant.

Walter H. Beckham, III, Jessee, Ritchie & Duncan, Karen W. Rowles, Atlanta, Ga., for defendants-appellees.

Before HILL, FRANK M. JOHNSON, Jr., Circuit Judges, and SCOTT *, District Judge.

CHARLES R. SCOTT, District Judge:

This action was brought by use plaintiff General Electric Supply Co. (hereinafter 'GE') against Wiring, Inc. (hereinafter 'Wiring'), an electrical subcontractor, to recover payment for materials supplied to Wiring in connection with two federal construction projects. Also named as defendants were Wiring president Ronald Terrell, who personally guaranteed the debts of Wiring to GE; John M. Murray, Jr. Construction Co. (hereinafter 'Murray'), the general contractor on the two government projects; and United States Fidelity & Guaranty Co. (hereinafter 'USF&G'), a surety company. Murray, as principal, and USF&G, as surety, had furnished a payment bond on each project for the protection of unpaid materials suppliers pursuant to the Miller Act, 40 U.S.C. §§ 270a et seq.

The case was tried without a jury before a United States Magistrate, sitting as a special master pursuant to Fed.R.Civ.P. 53. The special master determined that GE had made out a prima facie case of recovery against all defendants. He also found, however, that Murray and USF&G had established an affirmative defense to GE's claims on the Miller Act bonds and recommended that those claims be dismissed. By order dated September 26, 1979, and judgment dated September 28, 1979, the district court adopted, with one exception, the special master's report and recommendation.[1] On December 19, 1979, the district court entered an amended judgment clarifying some minor ambiguities contained in the original judgment.

---

* District Judge of the Middle District of Florida, sitting by designation.

1. The special master recommended that the entire amount of the unpaid balance owing from Wiring to GE on the federal-bonded projects be reallocated from the accounts to which the funds were applied, so as to extinguish the indebtedness on the two federal projects. This recommendation was drawn from his determination that Wiring had received sufficient funds from Murray during the relevant period to stand as a source for all payments made by it to GE, i.e., Murray had paid more money to Wiring from October 1975 through January 1977 than Wiring paid to GE during the same period.

He reached this conclusion despite the fact that in the first month funds began to flow from Murray to Wiring on the Chamblee project, Wiring received only $2,354.60 from Murray while paying $37,279.10 to GE. The special master conceded that it was inconceivable that funds from the government project constituted any of the $34,924.50 excess received by GE during that first month. Nevertheless, the special master felt bound to ignore the discrepancy and recommended reallocation of the entire amount.

The district court judge, noting the equitable nature of the misapplication defense to suits on Miller Act bonds, took cognizance of the fact that it was impossible that the $34,924.50 excess stemmed from the government projects. Consequently, the district judge subtracted this amount from $90,017.19, the total amount GE received from Wiring that was applied to project accounts other than Chamblee or Dobbins. This left $55,092.69 as the amount which could be reallocated to the federal projects. Accordingly, the district court entered judgment in favor of GE against Murray and USF&G for $8,101.15, i. e., the difference between $63,193.84 (total unpaid balance on federal projects) and $55,092.69.

In 1975, Murray, as general contractor, entered into two separate contracts with the United States to construct United States Army Reserve Centers at Dobbins Air Force Base (hereinafter 'Dobbins') and Chamblee, Georgia (hereinafter 'Chamblee'). In turn, Murray entered into two subcontracts with Wiring, whereby Wiring was to furnish the necessary labor and materials for the electrical systems on each project.

From October 1975 through January 1977, GE furnished Wiring with materials costing $68,909.61 for use on the Chamblee and Dobbins projects.[2] During this same time frame, Murray paid Wiring $121,781.94 on the two federal projects. This amount constituted only about 10 to 11 percent of Wiring's total receipts from all sources during the time the Chamblee and Dobbins projects were being constructed. Although GE received $95,732.96 from Wiring throughout this period, most of this amount was applied by GE, at Wiring's direction, to invoices outstanding on accounts other than the two federal projects. Of the $95,732.96 GE received from Wiring, only $5,715.77 was applied to either Chamblee or Dobbins, leaving an unpaid balance of $63,193.84 owing to GE on these projects.

As noted *supra*, the district court determined that GE had established a prima facie case on its Miller Act bond claims against Murray and USF&G. Nevertheless, the court dismissed those claims in large part, relying upon the equitable rule developed in Miller Act cases that where a materials supplier receives funds from a subcontractor knowing that the source of those funds is the general contractor on a government project, the supplier is obligated to apply those funds to the government project account.

■ It is well settled that once it has been determined that a supplier has know-

ingly misapplied funds, the misapplied funds must be reallocated to the proper accounts. *See, e.g., United States v. Federal Insurance Co.,* 483 F.2d 153 (5th Cir. 1973); *Graybar Electric Co. v. John A. Volpe Construction Co.,* 387 F.2d 55 (5th Cir. 1967); *R. P. Farnsworth & Co. v. Electrical Supply Co.,* 112 F.2d 150 (5th Cir.), cert. denied, 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454 (1940). The rationale for this rule is that it would be unfair to the principal and surety on the Miller Act bond to permit a supplier to collect old debts out of monies paid on a current government project, secure in the knowledge that he will be able to collect for the materials furnished on the government project by filing a claim against the bond.

In the instant case, the district court concluded that GE had applied funds received from Wiring to project accounts other than Chamblee and Dobbins, knowing that these funds had their source in payments from Murray on the government jobs. Consequently, the court ordered reallocation of the major portion of such funds to the Chamblee and Dobbins accounts, thereby leaving GE with an unsatisfied claim against Murray and USF&G in the amount of $55,092.69.[3] We are of the opinion that such a finding was error in that the record is devoid of evidence tending to prove that any funds derived from the government projects were misapplied.

■ At the outset of this discussion, it is important to delineate the standard governing our review of the district court's factual determination that a misapplication of funds occurred. Fed.R.Civ.P. 52(a) sets forth the rule that a trial court's findings of fact shall not be disturbed unless found to be "clearly erroneous." The rule provides further that the findings of a master, to the extent adopted by the district court, shall

---

**2.** GE had been Wiring's primary supplier for many years, providing roughly 90% of all materials used by Wiring in connection with its various electrical subcontracts. During the period GE was furnishing materials for use on the Chamblee and Dobbins projects, Wiring maintained 10 to 20 other active accounts with GE.

**3.** See note 1, *supra.* Judgment was entered against Ronald Terrell and Wiring in the full amount of the unpaid balance, i. e., $63,193.84.

be considered as findings of the court. Under the clearly erroneous standard of review, findings of fact can be set aside "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Company*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948).

■ Generally speaking, this Court is bound to apply the clearly erroneous standard in reviewing district court factual determinations. *Wilson v. Thompson*, 638 F.2d 799, at 801, (5th Cir. 1981); *Fitzgerald v. Peek*, 636 F.2d 943, (5th Cir. 1981). The reasons for this are obvious and extremely sound. Factual determinations are frequently based upon an assessment of the demeanor and credibility of witnesses, a matter appropriately entrusted to the discretion of the trial judge. *Marcum v. United States*, 452 F.2d 36, 39 (5th Cir. 1971); *Bowser v. Lloyd Brasileiro S.S. Co.*, 417 F.2d 779, 780 (5th Cir. 1969); *Gulf Banana Co. v. Reefer Shipping Corp.*, 391 F.2d 287 (5th Cir. 1968). Consequently, appellate courts should be loathe to set aside such determinations, exercising extreme caution not to substitute hindsight for insight.

■ Nevertheless, a distinction exists between so-called "subsidiary" facts, which are evidentiary or primary facts, and "ultimate" facts, which are the determinative conclusions drawn from the subsidiary facts. The clearly erroneous standard does not apply to ultimate fact determinations. *Danner v. United States Civil Service Commission*, 635 F.2d 427, at 430 (5th Cir. 1981); *Williams v. Tallahassee Motors, Inc.*, 607 F.2d 689, 690 (5th Cir. 1979); *East v. Romine, Inc.*, 518 F.2d 332, 338–39 (5th Cir. 1975); *Causey v. Ford Motor Co.*, 516 F.2d 416, 420–21 (5th Cir. 1975). Rather, the reviewing court is free to make an independent determination of the ultimate fact, guided by the district court's determination of subsidiary facts which are not themselves clearly erroneous. *Causey v. Ford Motor Company, supra*, at 421. Examples of what constitutes an ultimate fact are as varied as the law itself. *See, e. g., Danner v. United States Civil Service Commission, supra*, at 430 (a finding of discrimination is a finding of ultimate fact); *Industrial Instrument Corp. v. Foxboro Co.*, 307 F.2d 783, 786 n. 2 (5th Cir. 1962) (a finding of patent infringement is a finding of ultimate fact); *Gamble v. Commissioner*, 242 F.2d 586, 590 (5th Cir. 1957) (a finding that a gain should be classified as capital rather than ordinary for federal income tax purposes is a finding of ultimate fact).

■ In the case *sub judice*, the finding that a misapplication of funds occurred is a finding of ultimate fact. Absent such a finding, there would be no defense to GE's action against Murray and USF&G on the Miller Act bonds. The trial court's finding of a misapplication was the determinative conclusion upon which GE's claims lived or died. As such, it is proper for this Court to make an independent resolution of this question.

■ We need proceed no further than the first step, i. e., ascertainment of whether sufficient subsidiary facts have been established which would arguably support a finding of misapplication. In the absence of an adequate framework of subsidiary facts, there is no way to reach an ultimate conclusion that a misapplication ever occurred. Consider, by analogy, an archaeologist who is presented with a few old bones and requested to draw a picture of the animal from whence they came. He replies that he is unable to perform such a task unless he is supplied with more bones which would enable him to reconstruct the skeleton. Only then could he determine what kind of beast the bones belonged to and what it looked like. Similarly, in this case, insufficient evidence was presented to the special master to enable him to properly make a determination as to whether a misapplication of funds did or did not occur. The most that can be said is that it is possible that a misapplication occurred. It is equally possible, if not more so, that no misapplication occurred. The bottom line is that the evidence simply does not support a finding that GE misapplied funds stemming

from the federal projects to other older accounts of Wiring. As we have determined that the record fails to demonstrate that GE misapplied the funds at all, it follows *a fortiori* that the record fails to support a finding that GE *knowingly* misapplied such funds. Consequently, it is unnecessary to reach this issue.

In reviewing the record as to the threshold question of misapplication, we are struck by an almost total absence of proof presented by Murray and USF&G to support their affirmative defense. The burden of proving the affirmative defense of misapplication of funds in a Miller Act case is properly upon the party raising that defense. The special master's report states that federal jurisdiction over this case was founded upon diversity of citizenship. In diversity cases, it appears to be settled that the ultimate burden of proof on an issue is a matter of substance and, hence, under *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), is governed by state law. *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943); *Cities Serv. Oil Co. v. Dunlap*, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 (1939); *see generally* 5 C. Wright & A. Miller, Fed. Practice and Procedure § 1272. Although diversity of citizenship is the basis for federal jurisdiction as to the defendants Wiring and Ronald Terrell, Sr., the action against Murray and USF&G was brought pursuant to the Miller Act. Title 40 U.S.C. § 270b(b) provides that any action on a Miller Act bond shall be filed in the United States District Court, irrespective of the amount in controversy. As the claims on the Miller Act bonds involve the interpretation and application of federal law, state law does not control. *R. P. Farnsworth & Co. v. Electrical Supply Co.*, 112 F.2d 150, 154 (5th Cir.), *cert. denied*, 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454 (1940); *St. Paul Fire and Marine Ins. Co. v. United States for the use of Dakota Electric Supply*, 309 F.2d 22, 24 (8th Cir. 1962), *cert. denied*, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963).

In allocating the burden of proof on the issue of misapplication, we are guided not only by the general rule that one who asserts the existence of an affirmative defense has the burden of proving that defense,[4] but also by the remedial policy underlying the Miller Act. "The purpose of the Miller Act is to protect those who furnish labor and materials for public construction and to ensure that they will be paid for the same." *Graybar Electric Co. v. John A. Volpe Construction Co.*, 387 F.2d 55, 58 (5th Cir. 1967), *quoting St. Paul Mercury Indemnity Company v. United States for the use and benefit of H. C. Jones Construction Company*, 238 F.2d 917, 921 (10th Cir. 1957). "The Miller Act ... is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects." *Graybar Electric Co. v. John A. Volpe Construction Co., supra*, at 58, *quoting United States for the use and benefit of Sherman v. Carter*, 353 U.S. 210, 216, 77 S.Ct. 793, 796, 1 L.Ed.2d 776 (1957). In order to effectuate the remedial policy of the Miller Act to protect labor and materials suppliers, this Court holds that, once a supplier makes out a prima facie case entitling it to recover on a Miller Act bond, the burden of establishing a misapplication of funds lies with those seeking to avoid liability on the bond.

This does not mean that the party seeking to establish a misapplication is required to trace exact funds. *St. Paul Fire & Marine Insurance Co. v. United States, supra*; *United States for the use of Crane Co. v. Johnson, Smathers & Rollins*, 67 F.2d 121 (4th Cir. 1933); *see American Oil Co. v. Brown Paving Co.*, 298 F.Supp. 528 (D.S.C. 1969). It does mean, however, that the party must demonstrate by a preponder-

---

4. *See, e.g., Howard v. Green*, 555 F.2d 178, 181 (8th Cir. 1977); *Superior Oil Co. v. Devon Corp.*, 458 F.Supp. 1063, 1071 (D.Neb.1978), *rev'd on other grounds*, 604 F.2d 1063 (8th Cir. 1979); *Baczor v. Atlantic Richfield Co.*, 424 F.Supp. 1370, 1379 (E.D.Pa.1976); *Broward County, Florida Commission for the use and benefit of General Electric Co. v. Continental Casualty Co.*, 243 F.Supp. 118, 123 (S.D.Fla. 1965) (Miller Act case).

ance of the evidence that a misapplication has indeed occurred. In the instant case, while holding that Murray and USF&G were not required to trace exact funds, the district court turned around and essentially imposed this requirement upon GE. In so doing, the district court imposed what amounted to a conclusive presumption that funds from the government projects were misapplied. Only in the instance where GE proved it was absolutely impossible that funds had been misapplied did the court deviate from this presumption.

Neither Murray nor USF&G introduced any evidence tending to prove a misapplication. On the other hand, GE presented an expert witness, Richard G. Deemer, an accountant, who had conducted a painstaking review of all relevant books and records and concluded that he did not believe a misapplication had occurred. The results of Deemer's analysis are summarized in Appendix A and Appendix B to this opinion.[5]

An analysis of these two charts, which along with the testimony of Deemer consti-

tuted the only real evidence at trial tending to show what became of the federal project funds paid out by Murray to Wiring,[6] reveals that it was either impossible or extremely unlikely that a major portion of the funds at issue was ever misapplied. As to the remaining funds, the most that can be said is that it is possible that they were misapplied. Such a naked possibility falls short of the preponderance of evidence required to be produced on behalf of Murray and USF&G to support a finding of misapplication.

At the outset, it is important to note that throughout the relevant period Wiring was receiving substantially greater sums of money each month from various outside sources than it was either receiving from Murray or paying out to GE. Thus, while Wiring paid GE a total of $90,017.19 on project accounts other than Chamblee and Dobbins from October 1975 to January 1977, its total receipts from all sources during the same period totalled $1,037,253.71. Subtracting from this amount the $121,-

---

5. Appendix A, admitted at trial as plaintiff's exhibit 36, pertains solely to the Chamblee project. Appendix B, admitted at trial as plaintiff's exhibit 37, pertains solely to the Dobbins project. The Court is satisfied that these exhibits contain accurate information. Although counsel for appellees attempted to discredit the reliability of these two charts by pointing out discrepancies between the charts and Wiring's disbursement journal, Deemer's subsequent testimony established that the discrepancies were illusory. For example, the witness was questioned on cross-examination as to why certain checks appearing in Wiring's disbursement journal as having been written to GE in a particular month did not appear on his charts as being received by GE during that same month. On redirect examination, the witness explained that the charts reflect receipts of Wiring checks by GE as of the date GE deposited the checks into its account, rather than the date the checks were written. This proved to be a much more reliable method of calculating receipts than by simply relying upon Wiring's disbursement journal in that the journal showed several checks as having been written to GE when, in fact, the checks were subsequently voided and never reached GE.

The charts are more or less self-explanatory. The column headings, with the exception of column 2, clearly designate the information set forth below. Column 2, titled "Monthly Total Deposits" reflects Wiring's total monthly re-

ceipts from all sources deposited into its general operating account. All monies received by Murray were deposited into this operating account, with two exceptions—a $15,000 check dated December 2, 1976 deposited in a South Carolina operating account and a check dated August 24, 1976, in the amount of $6,010.88 which was deposited in Ronald Terrell's personal account.

6. There was some testimony by Ronald Terrell and Dow Kirkland, assistant treasurer of Wiring, that several meetings were held with Jim Caddy, GE's credit manager, at which they discussed what funds Wiring was expecting during a particular month and how those funds would be applied to pay off Wiring's indebtedness to GE. The testimony consisted mostly of generalities. For example, Terrell testified that he would tell Caddy that Wiring was expecting money from three or four contractors, and that Murray was probably included in that list from time to time. He testified that the only meeting at which they specifically discussed money to be received from Murray and how it was going to be disposed of occurred in "late '76." As will be discussed in greater detail *infra*, the evidence showed that only $2,110.30 was paid to GE on accounts other than Chamblee and Dobbins from October 1976 until January 1977, the last month in which any payments were made by Murray to Wiring.

781.94 that Wiring received from Murray on the federal projects, Wiring was left with more than $900,000.00 derived from other projects that could have constituted the source of the payments made to GE which the district court ordered to be reallocated.

## CHAMBLEE

Turning specifically to the Chamblee project, it is apparent from Appendix A that no misapplication could possibly have occurred during the first five months of construction on that project, i. e., October 1975 through February 1976.[7] In October and November of 1975, although Wiring was receiving money from Murray, there were *no amounts owing to GE on Chamblee or Dobbins*. Consequently, GE was not bound to apply any of the $38,664.54 received from Wiring during those two months to either of the federal project accounts.

A similar situation was presented in *United States v. Federal Insurance Co.*, 483 F.2d 153 (5th Cir. 1973). Due to the subcontractor's inability to post a performance bond, the general contractor, in order to protect itself, initiated a payment procedure whereby it issued joint checks payable to the subcontractor and the subcontractor's supplier. The supplier, after deducting all amounts owing for supplies already furnished, turned over the remaining proceeds from the joint checks to the subcontractor. In the supplier's suit against the general contractor on the Miller Act bond, the district court held the supplier was estopped from pursuing its claim for the amount due on its supply account with the subcontractor, reasoning that if the supplier had simply kept all amounts received via the joint checks, it would have been paid in full.

This Court disagreed and reversed the district court decision. The panel concluded that the supplier properly withheld only the amounts due at the time the joint checks were issued. This reasoning accords with the practicalities of the situation. It would place an intolerable burden upon both the supplier and the subcontractor to require the supplier to hold payments by the subcontractor "in trust", refusing to apply them to any outstanding invoices until something became due and owing on the federal project.

In the instant case, Wiring had between ten and 20 other outstanding project accounts with GE throughout the period in which Chamblee and Dobbins were being constructed. Yet appellees would have us say to GE, "Well, we know Wiring owed you hundreds of thousands of dollars on these ten to 20 other accounts, and we realize Wiring owed you nothing on the federal project accounts. We also recognize that Wiring was receiving substantial sums of money from sources other than Murray. Nevertheless, you should have held every dime received from Wiring in trust for the two federal projects, refusing to apply it to the specific accounts requested by Wiring, regardless of where Wiring got the money from."

We decline to do so. GE was free to apply the money received from Wiring at a time when nothing was due on the Chamblee and Dobbins accounts in accord with Wiring's specific directions. Thus, there was no misapplication of Murray funds during October and November of 1975.

As for December 1975 and January 1976, no money could possibly have been misapplied during these months because no money was paid to GE on *any* account. Likewise, no funds could have been misapplied in February 1976 because Wiring paid GE the entire amount then owing on the Chamblee account, i. e., $433.27.

---

7. Appendices A and B reflect the periods of time from the first to last receipts of money by Wiring from Murray on the Chamblee and Dobbins projects, respectively. Note that such receipts on the Dobbins project did not begin until June 1976. Although the charts are separate and distinct in that each pertains to a separate construction project, they overlap in some areas, e. g., columns 2 ("Monthly Total Deposits") and 6 ("Payments by Wiring for Other GE Invoices"). Reference should be made to these appendices to facilitate understanding of the ensuing discussion.

March 1976 is the first month in which a misapplication could possibly have occurred. Wiring received $1,341.40 from Murray on the Chamblee account and paid $10,631.59 to GE, none of which was applied to the $383.63 owing on Chamblee. No evidence was offered, however, to show that funds were misapplied during this month. Indeed, the fact that Wiring received $49,513.26 from other sources that month while receiving only $1,341.40 from Murray would tend to support a contrary conclusion.

While it is conceivable that the monies paid to GE in April and May of 1976 were misapplied, the total amount applied by GE to other accounts throughout those two months consisted of only $122.40. In June 1976, Appendix A reflects that $20,173.16 was applied by GE to accounts other than Chamblee, yet no money was paid to Wiring from Murray that month on Chamblee. Although it is possible that a portion of the $20,173.16 stemmed from Murray payments received in previous months, it is more likely that this money had its source in the $67,925.66 Wiring received in June from sources other than Murray.

In reference to July, August and September of 1976, we again find the situation where, although it is possible that a misapplication occurred, no evidence was presented to support such a determination. Moreover, as in every month under consideration, Wiring received substantially greater amounts from sources unrelated to the federal projects than it either received from Murray or paid out to GE.

Finally, we come to the last three months in which Wiring received funds from Murray on the Chamblee project. Appendix A clearly demonstrates the impossibility of any misapplication occurring during October, November or December of 1976 by the simple fact that the only money flowing from Wiring to GE throughout those months was a $2,925.21 payment applied to the Chamblee account.

8. Column 6 of Appendix B reflects that $2,925.21 was applied by GE to invoices other than Dobbins in October 1976. A reference to

## DOBBINS

Commencing an analysis of the Dobbins project, Appendix B indicates that no misapplication could have occurred during the first three months of that project because, as was true of Chamblee, no amounts were owing to GE on that account during those first months with the exception of $9.39 which was duly paid. September 1976 is the first month that a misapplication of Murray funds paid out on Dobbins conceivably could have occurred. Once again, however, no evidence was presented to show that a misapplication did in fact occur during September.

No Murray funds could have been misapplied in October, November or December of 1976 because no funds were paid to GE during those months on any project except Chamblee.[8] As for January 1977, it is conceivable that the $2,110.30 applied by GE to accounts other than Dobbins or Chamblee stemmed from Murray payments, but it would have had to flow from payments occurring prior to December 1976 for it was established at trial that the $8,205.06 paid by Murray to Wiring in January went to pay Wiring's laborers.

In summarizing the flow of funds from Murray to Wiring and from Wiring to GE throughout the construction of Chamblee and Dobbins, two general observations can be made. First, it is apparent that during the majority of months pertinent to either the Chamblee or Dobbins accounts, little or no misapplication of funds stemming from those projects could have occurred. In the remaining months, while it is conceivable that funds having their source in Murray payments to Wiring could have been improperly applied by GE to accounts other than Chamblee or Dobbins, the record is devoid of evidence to support such a finding.

 We reiterate that Murray and USF&G were not required to trace exact funds in order to establish a misapplication.

Appendix A reveals that this amount was applied to the Chamblee account.

They were, however, required to show by a preponderance of the evidence that some misapplication had in fact occurred.[9] They chose instead to place the cart before the horse and concentrate on establishing GE's *knowledge* of misapplication, ignoring the threshold issue of misapplication almost entirely.

We note that the affirmative defense of misapplication of funds in Miller Act cases is equitable in nature. In evaluating the equities involved in this matter we are guided by the purpose of the Miller Act, which is to protect those who furnish materials and/or labor for use on federal projects. It is clear that between Murray and GE, Murray was in the best position to protect itself against loss resulting from the inability of its subcontractor to pay for materials utilized in performing the subcontract. This could have been accomplished, e. g., by issuing joint checks payable to both Wiring and GE or by requiring Wiring to post a bond. Murray was fully aware that GE was Wiring's primary supplier. Yet Murray neglected to follow what he testified was his standard procedure of telephoning the supplier subsequent to the making of initial payments to the subcontractor to ensure that the subcontractor was paying its bills.

The special master and the district court found that Murray justifiably relied upon misrepresentations made by officers of GE, which misrepresentations obviated the need for Murray to take any precautions to police Wiring's activities in regard to paying GE. The finding that GE made misrepresentations was clearly erroneous. The

claimed misrepresentations are twofold. One consisted of a hand-written notation contained in Murray's Chamblee job file made by Don Hand, Murray's project manager, which read:

> Wiring now has outstanding balance of $200,000, plus or minus, but GE Supply says they will have no problems getting forty thousand dollars of materials since this is a government job.

The error in ruling that this was a misrepresentation is that every word contained in the note was true. Wiring was indebted to GE for approximately $200,000 at the time Wiring applied for credit on Chamblee and Dobbins, but GE agreed to extend $40,000 additional credit because they were government jobs and GE knew it would be protected by Miller Act bonds. Hand was not called as a witness at trial, but Murray testified that he interpreted the note to mean that GE must have had great confidence in Wiring to have extended $200,000 in credit. Counsel for GE properly contended that GE could not be held responsible for Murray's misinterpretation of accurate information. No misrepresentation occurred in regard to this note.

The second claimed misrepresentation consisted of a telephone call placed from Murray to GE in which an unidentified person at GE allegedly told Murray that there were no problems with Wiring's account. This conversation took place prior to any shipment of materials to either Chamblee or Dobbins and there is no evidence that the status of Wiring's account at the time of the call was any different from

---

**9.** Once it is established that a misapplication has in fact occurred and that the supplier had knowledge of the misapplication, the district court is free to order reallocation only of those funds which are so inextricably related to the misapplied funds as to make it unreasonably difficult to separate them. Thus, if the supplier received a $10,000 check from the subcontractor in Month A knowing that a portion of the payment had its source in a federal project, the court would be free to order reallocation of the entire $10,000. The court could not, however, properly order reallocation of a payment received in Month B simply on the basis of the

misapplication shown to have occurred in the previous month. This is how we interpret the rule enunciated in *Graybar Electric Co. v. John A. Volpe Construction Co., supra*, at 59, that:

> [W]hen a creditor comes into possession of funds under circumstances that he knows or is chargeable with knowledge that all or a portion of the source of such funds is from a general contractor on a public project, the creditor is bound to apply *such funds* to the job account of the principal or general contractor notwithstanding any directions he may receive from his payor. (Emphasis added).

that reflected in the note discussed above. We are of the opinion that no misrepresentations were made by GE to Murray which would justify the failure of Murray to take steps to protect itself.

Accordingly, based upon the reasoning and analysis set forth above, we REVERSE the decision below and REMAND this cause to the district court for entry of judgment in accordance with this opinion.

REVERSED and REMANDED.

# APPENDIX A

### CHAMBLEE PROJECT

(Operating Account – Georgia)

DEPOSITS TO WIRING OPERATING ACCOUNT WIRING PAYMENTS

| Month and Year | Monthly Total Deposits | Monthly Deposits of Murray Payments on Chamblee | GE Invoices of Chamblee Material Due on 20th of Month | GE Invoices for Chamblee Paid | Payments by Wiring for Other GE Invoices |
|---|---|---|---|---|---|
| 10/75 | $ 134,686.21 | $ 2,354.60 | $ –0– | $ –0– | $ 37,279.10 |
| 11/75 | 86,365.90 | 4,211.57 | –0– | –0– | 1,385.44 |
| 12/75 | 87,679.89 | 16,153.17 | 15.60 | –0– | –0– |
| 1/76 | 91,722.47 | –0– | 15.60 | –0– | –0– |
| 2/76 | 60,150.93 | 11,088.20 | 433.27 | 433.27 | 3,026.10 |
| 3/76 | 49,513.26 | 1,341.40 | 383.63 | –0– | 10,631.59 |
| 4/76 | 59,674.07 | –0– | 1,612.11 | –0– | 2.12 |
| 5/76 | 58,468.27 | 18,587.36 | 4,740.93 | –0– | 120.28 |
| 6/76 | 67,925.66 | –0– | 21,082.13 | 383.63 | 20,173.16 |
| 7/76 | 64,302.29 | 3,671.29 | 20,698.50 | 1,432.09 * | 4,019.98 |
| 8/76 | 69,648.92 | –0– | 30,546.66 | –0– | 9,634.64 |
| 9/76 | 61,283.04 | 2,321.64 | 31,178.94 | 532.18 | 1,567.92 |
| 10/76 | 56,599.22 | 6,708.94 | 33,957.89 | 2,925.21 | –0– |
| 11/76 | 24,177.04 | 5,000.00 | 34,650.21 | –0– | –0– |
| 12/76 | 45,242.26 | 2,436.72 | 35,037.42 | –0– | –0– |
| **TOTAL** | **$1,016,902.08** | **$ 73,874.89** | | | **$ 87,840.33** |

\* Paid out of joint check from G. C. Bailey

## A P P E N D I X B

### DOBBINS AFB PROJECT
(Wiring Operating Account – 096–09–306)

DEPOSITS TO WIRING OPERATING ACCOUNT WIRING PAYMENTS

| Month and Year | Monthly Total Deposits | Monthly Deposits of Murray Payments on Dobbins | GE Invoices of Dobbins Material Due on 20th of Month | GE Invoices for Dobbins Paid | Payments by Wiring for Other GE Invoices |
|---|---|---|---|---|---|
| 6/76 | $ 67,925.66 | $ 3,617.10 | $ –0– | $ –0– | $ 20,173.16 |
| 7/76 | 64,302.79 | 1,923.30 | 9.39 | 9.39 * | 4,019.98 |
| 8/76 | 69,648.97 | 1,000.00 | –0– | –0– | 9,634.64 |
| 9/76 | 61,283.04 | 10,611.84 | 6,248.33 | –0– | 2,100.10 |
| 10/76 | 56,599.22 | 12,538.05 | 6,953.55 | –0– | 2,925.21 |
| 11/76 | 24,177.04 | 10,011.70 | 20,309.61 | –0– | –0– |
| 12/76 | 45,242.26 | –0– | 26,436.48 | –0– | –0– |
| 1/77 | 20,351.63 | 8,205.06 | 27,490.95 | –0– | 2,110.30 |
| 2/77 | 19,483.54 | –0– | 28,156.42 | –0– | 66.56 |

| | | | * Paid by joint check | | |
| **TOTALS** | $ 429,012.99 | $ 47,907.05 | from G. C. Bailey | | $ 41,029.95 |